# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Oglala Sioux Tribe

**DEFENDANTS**

The United States of America (see attachment for others)

**(b)** County of Residence of First Listed Plaintiff  Oglala Lakota Cty., SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Washington DC
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 702; 25 U.S.C. §§13, 2801 and 3601
Brief description of cause:
Violation of Treaty obligations and ISDEAA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE  Chief Judge Roberto A. Lange

DOCKET NUMBER  5:22-cv-05066-RAL

DATE  Oct 17, 2025

SIGNATURE OF ATTORNEY OF RECORD  /s/ Gregory M. Narvaez

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

I.(c). Plaintiff's Attorneys:
PEEBLES BERGIN SCHULTE & ROBINSON LLP
Gregory M. Narvaez, SD Bar No. 4381
2020 L. Street, Suite 250
Sacramento, CA 95811
Tel. (916) 441-2700
gnarvaez@ndnlaw.com
Lead Attorney

Conly Schulte, CO Bar # 44370 *Pro hac vice pending*
PEEBLES BERGIN SCHULTE & ROBINSON LLP
945 Front St.
Louisville, CO 80027
Tel. (303) 284-8228
cschulte@ndnlaw.com

Steven J. Bloxham, CA Bar No. 096384 *Pro hac vice pending*
PEEBLES BERGIN SCHULTE & ROBINSON LLP
2020 L. Street, Suite 250
Sacramento, CA 95811
Tel. (916) 441-2700
sbloxham@ndnlaw.com

Patricia A. Marks, DC Bar No. 446702 *Pro hac vice pending*
15992 A.E. Mullinix Rd.
Woodbine, MD 21797
202-256-5033
markspattyesq@aol.com


I. Defendants:
THE UNITED STATES OF AMERICA
THE UNITED STATES DEPARTMENT OF THE INTERIOR THE BUREAU OF INDIAN AFFAIRS
Department of the Interior: Doug BERGUM, Secretary of the Interior
Bureau of Indian Affairs: Richard (Glen) MELVILLE, Deputy Bureau Director, Bureau of
    Indian Affairs - Office of Justice Services
Bureau of Indian Affairs: Terry MCCLOUD, Acting Special Agent in Charge/Approving
    Official, Bureau of Indian Affairs - Office of Justice Services
Bureau of Indian Affairs: Bryan MERCIER, Director, Bureau of Indian Affairs
Bureau of Indian Affairs: Gina DOUVILLE, Superintendent of the Pine Ridge Agency,
    Bureau of Indian Affairs

### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH DAKOTA
### WESTERN DIVISION

| | |
|---|---|
| OGLALA SIOUX TRIBE, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA;<br><br>DOUG BURGUM, in his  official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W. Washington DC 20240;<br><br>UNITED STATES BUREAU OF INDIAN AFFAIRS;<br><br>RICHARD (GLEN) MELVILLE, in his official capacity as DEPUTY BUREAU DIRECTOR, OFFICE OF JUSTICE SERVICES, UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS;<br><br>TERRY MCCLOUD, in his official capacity as ACTING SPECIAL AGENT IN CHARGE/APPROVING OFFICIAL, OFFICE OF JUSTICE SERVICES, UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS;<br><br>BRYAN MERCIER, in his official capacity as DIRECTOR, BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR;<br><br>And<br><br>GINA DOUVILLE, in her official capacity as SUPERINTENDENT OF THE PINE RIDGE AGENCY, BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Civil Action No.  5:25-cv-5080<br><br>**COMPLAINT** |

1

Comes now Plaintiff, OGLALA SIOUX TRIBE (the "Tribe"), a federally recognized Indian tribe, by and though its undersigned counsel, and complains of the Defendants, and each of them, as follows:

## JURISDICTION AND VENUE

1.  The action arises out of the United States' failure to adhere to its treaty and trust responsibility to provide and adequately equip a sufficient number of law enforcement officers on the Pine Ridge Indian Reservation to reasonably ensure that the Defendants are providing for timely and diligent investigation of all violations of federal and tribal law, and for the arrest and punishment of offenders, and for violations of the Indian Self Determination and Education Assistance Act of 1975 ("ISDEAA"), 25 U.S.C. §§ 5301 *et. seq.*, as stated herein.

2.  This Court has jurisdiction over the subject matter of this action pursuant to: (a) 28 U.S.C. § 1331 (federal question action), as this is a civil action arising under the Constitution, laws or treaties of the United States; (b) 28 U.S.C. § 1362 (federal question action brought by an Indian tribe), as this is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior ("Secretary") and the matter in controversy arises under the Constitution, laws or treaties of the United States; (c) 25 U.S.C. § 5331(a) (action under Indian Self-Determination Act), as this is a civil action against the Secretary of the Interior arising under the ISDEAA; and (d) 28 U.S.C. § 1361 (mandamus against federal official), as this is an action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff.

3.  This action arises under the Constitution, laws and treaties of the United States, as hereinafter more fully appears, including but not limited to: the Commerce Clause, U.S.

Const. Art. 1, § 8, cl. 3; the Treaty Clause, U.S. Const. Art. 2, § 2, cl. 2; the Supremacy Clause, U.S. Const. Art. 6, § 2; the Treaty with the Sioune and Oglalla Tribes, July 5, 1825, 7 Stat. 252 ("1825 Treaty"); the Treaty of Fort Laramie with the Sioux Etc., Sept. 17, 1851, 11 Stat. 749 note and 2 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 594 & note (1904) (hereinafter "Kappler") ("1851 Treaty"); the Treaty with the Sioux—Brulé, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee—and Arapaho, Apr. 29, 1868, 15 Stat. 635 ("1868 Treaty"); the Act of Feb. 28, 1877, c. 72, 19 Stat. 254 ("1877 Act"); the Snyder Act of 1921, 25 U.S.C. § 13 ("Snyder Act"); the Indian Self-Determination and Education Assistance Act of 1975 ("ISDEAA"), 25 U.S.C. §§ 5301 *et. seq.*; the Indian Law Enforcement Reform Act of 1990 ("ILERA"), 25 U.S.C. § 2801 *et. seq.*; the Tribal Law and Order Act of 2010 ("TLOA"), Pub. L. No. 111-211, Title II, 124 Stat. 2258 (2010), codified in scattered sections of 18 U.S.C., 25 U.S.C., 28 U.S.C. and 42 U.S.C.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* and §§ 701-706; the Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202; and the federal common law.

4. The United States has waived its sovereign immunity from suit in this action under 25 U.S.C. §§ 5321(b)(3), 5331(a) and (d) (incorporating the Contract Disputes Act, 41 U.S.C. § 7104) for civil actions against the Secretary of the Interior arising under the ISDEAA for relief including money damages, injunctive relief, or mandamus.

5. The United States has waived its sovereign immunity from suit in this action under section 702 of the APA, 5 U.S.C. § 702. Section 702 waives sovereign immunity for all claims for relief other than monetary damages, including all forms of equitable relief, involving a federal official's action or failure to act.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1), because the
Tribe and the Pine Ridge Indian Reservation are located within the District of South
Dakota, Defendant Gina Douville's office is located within this judicial district, the
Department of the Interior is an agency of the United States, and a substantial part of the
events or omissions giving rise to the claims herein occurred and are still occurring within
this judicial district.

## PARTIES

7.      Plaintiff OGLALA SIOUX TRIBE ("Tribe") is a federally recognized Indian tribe,
recognized to have the immunities and privileges available to federally recognized Indian
Tribes by virtue of their Government-to-Government relationship with the United States
as well as the responsibilities, powers, limitations, and obligations of such Indian Tribes.
*See Indian Entities Recognized by and Eligible to Receive Services From the United States
Bureau of Indian Affairs*, 89 Fed. Reg. 99899, 99900 (Dec. 11, 2024). The Tribe's
governmental headquarters is located at 107 West Main Street, P.O. Box 2070, Pine Ridge,
South Dakota 57770.  The Tribe is organized under a Constitution pursuant to section 16
of the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 5123 (formerly 25 U.S.C.
§ 476), with a governing body known as the Tribal Council.

8.      The Tribe is one of the bands of the Lakota and is both a part of and a successor in interest
of the "Sioux Nation." *See*, *Sioux Tribe of Indians v. United States*, 14 Cl.Ct. 94, 95 n. 1
(1987), *aff'd*, 862 F.2d 275 (Fed. Cir. 1988).  The Oglala band is both a signatory of and a
party to the 1825, 1851, and 1868 Treaties, and the Tribe and its members are beneficiaries
of the covenants contained therein.  The Tribe brings this action in its governmental
capacity to protect its sovereign interests.  The Tribe, as beneficiary of the United States'

duties under the 1825, 1851 and 1868 Treaties, the 1877 Act, the federal law enforcement statutes detailed herein, and as recipient and beneficiary of the federal law enforcement services and funding provided by Defendants and in dispute in this action, suffers its own injury from Defendants' actions complained of herein.  The threat to the health and safety of all tribal members caused by Defendants' actions and failures to act complained of herein is a specific component of the Tribe's sovereign governmental interest.  The Tribe also brings this action as *parens patriae* on behalf of all of its Tribal members and raises claims that affect each of those members. The Tribe has a quasi-sovereign interest in the disputes herein, apart from the interests of its Tribal members, and there is an injury to a substantial segment of the Tribe's population.

9.      Defendant the UNITED STATES OF AMERICA is a party to the 1825, 1851, and 1868 Treaties and is responsible for fulfilling the requirements of the statutes detailed herein.  It acts through and is responsible for the actions of its authorized agencies, officials, employees and agents, the other defendant parties described below.

10.     Defendant  DOUG BURGUM is the Secretary of the Interior ("Secretary").  The Secretary is responsible, *inter alia*, "for providing, or for assisting in the provision of law enforcement services in Indian county."  25 U.S.C. § 2802(a).  He is sued herein in his official capacity.

11.     Defendant UNITED STATES BUREAU OF INDIAN AFFAIRS ("Bureau of Indian Affairs" or "BIA") is the federal agency through which the Secretary acts in fulfilling his Indian law enforcement responsibilities in Indian country and the federal agency which contracts with the Oglala Sioux Tribe under the ISDEAA.

12.     Defendant RICHARD (GLEN) MELVILLE is the Director of the Office of Justice

5

Services within the Bureau of Indian Affairs.  He is sued herein in his official capacity. The Office of Justice Services ("Office of Justice Services" or "OJS") is an office within the BIA "that, under the supervision of the Secretary, or an individual designated by the Secretary," is responsible for, *inter alia*, "carrying out the law enforcement functions of the Secretary in Indian country and implementing" related specified responsibilities under the ILERA.  25 U.S.C. § 2802(b)-(e). *See also* Dept. of Interior Manual, 130 DM 4.1 (2015).

13. Defendant TERRY MCCLOUD is the Acting Special Agent in Charge/Approving Official of the Office of Justice Services. His position makes him responsible for overseeing all BIA-funded law enforcement services provided in the Great Plains Region of the United States, including law enforcement services on the Pine Ridge Indian Reservation.  He is also the Approving Official for the Office of Justice Services.  In that capacity, he issued both of the agency's September 3, 2024, letter to the Tribe as well as the agency's October 17, 2024, partial denial of contract letters which are the subject of this Complaint.  He is sued herein in his official capacity.

14. Defendant BRYAN MERCIER is the Director of the Bureau of Indian Affairs.  In this capacity, he administers all laws governing the non-education portions of Indian Affairs and provides leadership and direction for the Bureau of Indian Affairs. Dept. of Interior Manual, 130 DM 3.1.  He is responsible for the overall management of Defendant Bureau of Indian Affairs and the activities, functions, programs, and services that it engages in. He is sued herein in his official capacity.

15. Defendant GINA DOUVILLE is the Superintendent of the Pine Ridge Agency of the Bureau of Indian Affairs.  She currently serves as the United States' Indian Agent at the

Pine Ridge Agency.  She is sued herein in her official capacity.

## <u>INTRODUCTION</u>

16.     Plaintiff seeks to enforce the Defendants' obligation to provide effective law enforcement within the Tribe's territory under treaties with the Tribe, federal statutory and common law, and the United States' trust responsibilities to the Oglala Sioux Tribe.

17.     This is a duty the United States undertook when it entered into and ratified the 1825, 1851, and 1868 Treaties with the Tribe, and has acknowledged in relevant federal statutes, including the 1877 Act, the Snyder Act, the ILERA, the TLOA and the ISDEAA.

18.     This obligation requires the United States government to provide sufficient resources to ensure the prompt and diligent reporting and investigation of all crimes, and the arrest and punishment of all offenders who violate federal law and (pursuant to federal statute) tribal law, or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member.  Such obligation to the Tribe specifically includes providing directly, or providing sufficient funding for, a sufficient number of law enforcement officers and criminal investigators within the boundaries of the Tribe's territory, the Pine Ridge Indian Reservation ("Pine Ridge Reservation" or "Reservation"), to assure that the level and overall effectiveness of those services is in compliance with its Treaty obligations and statutory and trust responsibilities.

19.     These law enforcement activities are not a discretionary federal program which the Defendants can chose to operate or not operate, or chose to operate at a minimal level. They are instead a treaty and trust obligation, the primary responsibility or the performance of which has been assigned to the Secretary of the Interior.

20.     Defendants are failing to meet this obligation, not because the Congress has failed to enact

the statutes required to allow it to do so, but because Defendants fail to treat law enforcement as a treaty and trust obligation, rather than a discretionary function or program that they can chose to perform or not perform.  As a result, there is a complete lack of adequate and effective law enforcement within the Tribe's Reservation, and the impacts to the Tribe and its members have been and continue to be catastrophic.

21.    The Tribe seeks declaratory and injunctive relief that requires Defendants to provide sufficient law enforcement resources to comply with the obligations to the Tribe that the United States undertook in the Treaties and charged Defendant officials with the duty to perform in relevant federal statutes.

## **GENERAL ALLEGATIONS**

I.    **The Law Enforcement Obligations Undertaken by the United States to the Tribe in the 1825 Treaty and the Fort Laramie Treaties of 1851 and 1868**

22.    Since its earliest days, the United States Supreme Court has consistently recognized the special duty the federal government assumed in treaties with federally recognized Indian Tribes.  *See, e.g., Worcester v. Georgia*, 31 U.S. 515 566-57 (1832).

23.    Seeking to secure peace with the tribes and to ensure safe federally controlled trade in the area, on July 5, 1825, the United States, pursuant to its constitutional authority, entered into the 1825 Treaty with the Sioune and Ogallala bands.  Treaty with the Sioune and Oglala Tribes, July 5, 1825 ("1825 Treaty"), 7 Stat. 252 (1825).

24.    Pursuant to that 1825 Treaty, the Sioune and Ogallala bands formally acknowledged "that they reside within the territorial limits of the United States and acknowledged their [United States] supremacy and claim their protection" and the United States agreed to receive them "into their friendship, and under their protection."  *Id*., arts. 1 and 2.

25.    In exchange for its right to license and regulate traders in the region, the United States

further pledged that "the friendship, which is now established between the United States and the Sioune and Ogallala bands should not be interrupted by the misconduct of individuals . . . ." *Id*., art. 4.

26.    More specifically, in exchange for the Tribe's voluntary relinquishment of its sovereign right to seek retribution again non-members who violated the law, and the promise of the federal protection the Tribe was to receive, the parties reached the following agreement:

> it is hereby agreed that for injuries done by individuals, no private revenge or retaliation shall take place, but instead thereof, **complaints shall be made, by the injured party, to the superintendent or agent of Indian affairs**, or other person appointed by the President; and it shall be the duty of the Chiefs, upon complaint being made as aforesaid, **to deliver up the person or persons**, against whom the complaint is made, to the end that he or they may be **punished agreeably to the laws of the United States**. And, in like manner, if any robbery, violence or murder, shall be committed on any Indian or Indians belonging to the said bands, **the person or persons so offending shall be tried, and if found guilty shall be punished** in like manner as if the injury had been done to a white man. ...

*Id*., art. 5 (emphasis added).

27.    The 1825 Treaty was the first federal commitment to the Oglala provide federal law enforcement and related criminal justice system services in Oglala territory.

28.    The 1825 Treaty also for the first time formally established the legal relationship between the Oglala Tribe and the United States. The "claim" by the Oglala band to the "protection" of the United States and the reciprocal agreement by the United States "to receive [the Oglala band] into their friendship, and under their protection" created a well-understood "protectorate" relationship between the United States and the Oglala Tribe. *Id.* at arts. 1 and 2. *See, e.g.*, *Worcester*, 31 U.S. at 551-555, 560-561. *See generally* Seth Davis, Eric Biber & Elena Kempf, *Persisting Sovereignties*, 170 U. Pa. L. Rev. 549, esp. 624-625

9

(2022); Matthew L.M. Fletcher, *The Dark Matter of Federal Indian Law: The Duty of Protection*, 75 Me. L. Rev. 306 (2023).

29.    The United States understood and agreed that by virtue of this protectorate relationship, its obligations as the protector owed to the protected Tribe included not only a protected trade relationship, but "of still more importance, [that] the strong hand of government [be] interposed to restrain the disorderly and licentious from intrusions into their country, from encroachments on their lands, and from those acts of violence which were often attended by reciprocal murder." *Worcester*, 31 U.S. at 552. *See also id.* at 555 ("The Indian nations were . . . necessarily dependent on [first Great Britain and thereafter the United States] for their protection from lawless and injurious intrusions into their country.").

30.    Following the signing of the 1825 Treaty, more non-Indians moved into the area. Kerry R. Oman, *The Beginning of the End: The Indian Peace Commission of 1867-1868*, 22 Great Plains Q. 35, 35-36 (2002).

31.    Later in 1851, the Oglala voluntarily agreed to allow the U.S. to establish roads, and military and other outposts in certain locations in their aboriginal territory. Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851 ("1851 Treaty"), art. 2, 11 Stat. 749 note, 2 Kappler 594 & note. They did this in exchange for, among other things, the United States binding itself to protect them from "the commission of all depredations by the people of the United States." *Id.* at art. 3. This was the second promise of federal law enforcement and related criminal justice system protections that the United States made to the Oglala.

32.    By the 1860's, in part because the federal troops who were supposed to be policing the Tribe's territory had been called away to fight in the Civil War, a series of major confrontations had arisen between the Tribes, including Oglala, and non-Indians, which

federal studies later concluded were largely due to "aggression of lawless white men" and insufficient federal enforcement.  Oman, *supra*, at 36.

33.     One of the major federal concerns at the time centered around the aggressive Sioux attacks on non-Indians who were traveling along the Bozeman Trail.  *Id.* at 36-41.  The U.S. and Sioux military actions that followed those attacks are commonly referred to by historians as the Powder River War.

34.     Given federal government's western expansion goals, by 1867 Congress had concluded that it was more cost effective to enter into additional treaties with certain tribes, including the Ogallala band, than it was to continue to attempt to control them by military force.  *Id.* Thus, when the United States asked the Oglala to come to Fort Laramie in the spring of 1868,  it had very specific goals:  (1) to bring an end to the Powder River War; (2) to stop violent Sioux retaliation against persons who threatened their people or property or otherwise committed criminal acts; (3) to set the boundaries of what is now commonly known as the "Great Sioux Reservation" and encourage the Sioux to move there; and (4) to promote peace between the parties.  *Id.* at 37.

35.     The 1868 Treaty that the United States proposed and later ratified not only renewed the promises the United States had made in the 1825 and 1851 Treaties, but it also expanded the federal government's commitments to provide the Oglala with some very specific law enforcement and related criminal justice system protections.  Treaty with the Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee and Arapaho, Apr. 29, 1868 *et seq.*, 15 Stat. 635 ("1868 Treaty").

36.     Article I of the 1868 Treaty includes two provisions commonly referred to as the "bad men" clauses.  The "bad men" clauses are key to understanding the origin of the federal

government's duty to provide effective law enforcement to the Tribe, thus they are set out at length as follows:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once **to cause the offender to be arrested and punished according to the laws of the United States**, and also reimburse the injured person for the loss sustained.[1]

And,

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians named solemnly agree that they will, upon proof made to their agent and notice by him, deliver the wrong-doer to the United States, **to be tried and punished according to its laws**; and in case they willfully refuse so to do, the person injured shall be reimbursed for his loss from annuities or other moneys due or to become due to them under this or other treaties made with the United States. And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper. But no one sustaining loss while violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor.

*Id.* at art. I (emphasis added).

37.     Article V of the 1868 Treaty states as follows:

> The United States agrees that the agent for said Indians shall in the future make his home at the agency building; that he shall reside among them, and keep an office open at all times for the purpose of **prompt and diligent inquiry** into such matters of complaint by and against the Indians **as may be presented for investigation under the provisions of their treaty stipulations**, as also for the faithful discharge of other duties enjoined on him by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his findings, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty.

---

[1] This role of the Commissioner of Indian Affairs is now delegated by statute to the OJS and the United States Attorney.  25 U.S.C. § 2802.

*Id.* at art. V (emphasis added).

38.    The protections promised by these provisions were of the utmost importance to the Tribe, and it is only logical to conclude that the still militarily powerful Oglala Sioux Tribe would not have agreed to the Treaty's provisions unless it felt assured that its people, its property, and its territory were now going to be policed by the United States effectively in compliance with its treaty obligations.

39.    This treaty language was understood by the Tribe as requiring that "bad men" would be "arrested . . . tried and punished," and that "prompt and diligent inquiry [would be made] into such matters of complaint by and against the Indians as may be presented for investigation…"  *Id.*, arts. I and V.  *See also Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1063 (D.S.D. 2016) ("treaties must be construed, not in accordance with the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.")  There was no language in the Treaty, and no discussion during the Treaty negotiations, that suggested that the federal government was going to be allowed to decide when and if it wanted to engage in these activities, or to limit these responsibilities based upon its unilateral decision as to how it wanted to spend its federal dollars.  *See Cheyenne River Sioux Tribe*, 205 F. Supp. 3d at 1063 (quoting *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999)) ("The Indian canons of construction also require courts to 'look beyond the written words to the larger context that frames the Treaty, including "the history of the treaty, the negotiations, and the practical construction adopted by the parties."'").

40.  Unlike education or health care, which can be procured from other private sources, law enforcement activities had to be performed as a governmental function, by a governmental entity with actual jurisdiction to do so.

41.  The 1868 Treaty was ratified by the Senate on February 16, 1869, and proclaimed by President Andrew Johnson on February 24, 1869.  15 Stat. 635 .

## II.  Congressional Reaffirmation and Implementation of the United States' Law Enforcement Treaty Obligations in 1877 and in Subsequent Appropriations

42.  Through the treaties listed above, the federal government has undertaken an exclusive and specific trust responsibility to ensure effective public safety to Indians.  *See*, Cohen's Handbook of Federal Indian Law § 20.07[1][a], (Nell Jessup Newton ed.) (2012 ed. & Supp. 2017).  Through legislation, the federal government recognized and reinforced this duty.

43.  On February 28, 1877, the Forty-Fourth Congress unilaterally enacted a statute to reaffirm the "agreement . . . with different bands of the Sioux Nation of Indians."  *See*, Act of February 28, 1877, c. 72, 19 Stat. 254 ("1877 Act").  The purpose of the 1877 Act, in part, was to reaffirm the provisions made in the 1868 Treaty, including the Article I "bad men" clauses and the Article V provision providing a federal agent responsible for investigating complaints by and against tribal members.  Thus, through the passage of the 1877 Act, the federal government reaffirmed its obligation to provide effective law enforcement and criminal justice system services to the Tribe on the Reservation.

44.  Along with confirming promises already made, Congress also unilaterally added additional commitments by inserting the following language:

> The provisions of said treaty of 1868 … shall continue in full force, and, with provisions of this agreement, shall apply to any country which may hereafter be occupied by the said Indians as a home; and **Congress shall, by appropriate legislation, secure to them an orderly government;** they

shall be subject to the laws of the United States, **and each individual shall be protected in his rights of property, person, and life**.

1877 Act, art. 8 (emphasis added).

45.    To begin to fulfill these commitments, in 1878, Congress began appropriating specific federal funds for federal Indian Law Enforcement in the Western tribal areas of the United States, including at the Pine Ridge Reservation.  Act of May 27, 1878, c. 142, 20 Stat. 63. Within the next few years, Congress began regularly appropriating such funds.  *See* Act of May 11, 1880, c. 85, 21 Stat. 114. This appropriation of funds displays the federal government's recognition of and intent to uphold their duties under the 1825, 1851, and 1868 Treaties.

46.    By the end of 1879, the federal Indian Agent at the Pine Ridge Agency had organized, deputized, and began equipping and paying a federal Oglala Sioux Tribal Police Force of over 50 men.  Mark Ellis, *Akicitas: The Pine Ridge Indian Police, 1879-1885,* South Dakota Hist. Soc'y, 185 (1999). This further confirmed the federal government's commitment to provide adequate on-reservation law and order services to the Oglala Tribe on the Pine Ridge Reservation.

47.    As noted above, federal law enforcement efforts expanded post Treaty.  By the fall of 1878, "all the problems encountered at other [federal] agencies seemed to be compounded… at the six federal agencies located within Sioux territories." William T. Hogan, *Indian Police and Judges* 83 (1980).  "There were more Indians, more room for them to roam, more opposition to the civilian programs, and along the Nebraska line and at the landings on the Missouri River, more whites to interfere." *Id.*

48.    This is reinforced in an 1879 report to the Commissioner of Indian Affairs, written by Federal Agent McGillycuddy, the federal Indian Agent at the Pine Ridge Agency.  In that

report, he justified the more than 50 federal Indian Police that he was employing at the Pine Ridge Agency in 1879 by noting that just over the Nebraska state line was a large Mexican settlement which he believed to be a "rendezvous for criminals and outlaws of all kinds" and he wanted "to keep the reservation free of such undesirable elements." *Id.* at 90-91.

49.     In a related report, McGillycuddy also noted that he was further concerned about Indian versus Indian conflict, noting specifically his concerns about potential local trouble from "Red Cloud, the principal chief at Rosebud." *Id.* at 91. Red Cloud, along with his warriors, had successfully closed the Bozeman Trail in the 1860's, and were resisting federal efforts on the Pine Ridge Reservation. *Id.* For those reasons, Professor Hagan concluded that "McGillycuddy fifty-man force [at Pine Ridge] was absolutely indispensable in administering the 4,000 square miles inhabited by 8,000 Indians." *Id.*

50.     By 1880, the Commissioner of Indian Affairs reported the broad scope of Indian Police authority over reservation law and order, stating in part:

> The practicability of employing an Indian police to maintain order upon an Indian reservation is no longer a matter of question. In less than three years the system has been put in operation at 40 agencies, and the total force now numbers 162 officers and 653 privates.
> . . .
>
> [A]t all agencies Indian policemen act as guards at annuity payments; render assistance and preserve order during ration issues; protect agency buildings and property; return truant pupils to school; search for and return lost or stolen property, whether belonging to Indians or white men; prevent depredations on timber, and the introduction of whisky on the reservation; bring whisky sellers to trial; make arrests for disorderly conduct, drunkenness, wife-beating, theft, and other offenses; serve as couriers and messengers; keep the agent informed as to births and deaths in the tribe, and notify him promptly as to the coming on the reserve of any strangers, white or Indian. Vigilant and observant by nature, and familiar with every foot-path on the reservation, no arrivals or de-partures, or clandestine councils can escape their notice, and with a well disciplined police-force an agent can keep himself informed as to every noteworthy occurrence taking place within the entire limit of his juris-diction.

16

1880 Ann. Rep. of the Comm'r of Indian Affs. to the Sec'y of the Interior, 1880 at IX-X,

located at *Oglala Sioux Tribe v. United States*, No. *5:22-cv-05066-RAL*, Doc. 73-4.

51. The federal government further expanded this federal authority in 1885 with the passage of the Major Crimes Act ("MCA"), 18 U.S.C. § 1153. The MCA expanded federal jurisdiction over Indians who commit crimes against other Indians within Indian Country. *Id.*

52. In upholding the MCA, the United States Supreme Court recognized the federal government's "duty of protection" that arose from the treaties. *United States v. Kagama,* 118 U.S. 375, 384 (1886). The Court noted that the duty of protection "has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen." *Id. See also Oglala Sioux Tribe v. United States*, No. 5:22-cv-05066-RAL, Opinion and Order Denying Defendant's Motion to Dismiss and Ruling Upon Plaintiff's Motion for Preliminary Injunction, Doc. 78 at 60, 77 (May 23, 2023).

53. After awarding re-occurring appropriations for federal law enforcement at the Pine Ridge Reservation for over 42 years, in the 1921 Snyder Act Congress provided the ongoing authorization and mandate for the BIA, under the Secretary's supervision, to "direct, supervise, and expend . . . for the benefit, care, and assistance of the Indians . . . ." 25 U.S.C. § 13.

54. One of the purposes set expressly forth in the Snyder Act is to provide funds for the employment of "Indian police." *Id.* From the Snyder Act's enactment forward, Congress has directed the Secretary to use funding appropriated by Congress to pay for "Indian police." *Id.*

III.    **Congressional Reaffirmation and Implementation of Law Enforcement Treaty Obligations in the Modern Era through Enactment of the ILERA, the TLOA and the ISDEAA**

A.    **The Indian Law Enforcement Reform Act of 1990**

55.    Following the Congressional "Indian police" directive in the 1921 Snyder Act, the Indian Law Enforcement Reform Act of 1990 ("ILERA"), Pub. L. No. 101-379, 104 Stat. 473 (1990), *codified as amended*, 25 U.S.C. § 2801 *et seq.*,  provided that the United States Secretary of the Interior, acting through the BIA, "shall be responsible for providing . . . law enforcement services in Indian country."  25 U.S.C. § 2802(a).  This, along with the Oglala Treaties, distinguishes law enforcement from other federally created programs, and made law enforcement services a non-discretionary obligation of the Secretary and the BIA.

56.    The ILERA created a specific division within the BIA called the Office of Justice Services ("OJS"), which it stated "shall be responsible for  . . . carrying out the law enforcement functions of the Secretary in Indian county."  25 U.S.C. § 2802(b)(1).

57.    The ILERA also articulates in even more specific terms what competence means in the context of the federal government's prior existing law enforcement duties and responsibilities owed to the Tribe.  For example, in ILERA, Congress authorized OJS to adopt a Bureau of Indian Affairs Office of Justice Services Law Enforcement Handbook (hereinafter the "Handbook").  25 U.S.C. § 2802(c)(9).  The adopted Handbook establishes a comprehensive list of standards that all tribal law enforcement programs must meet, many of which are today unfunded mandates on the Pine Ridge Indian Reservation. It even states what items can and cannot be included in law enforcement agreements between the Tribe and local government units.  *See* Bureau of Indian Affairs Office of Justice Services Law

18

Enforcement Handbook (3rd ed. 2015), available at Bureau of Indian Affs., Off. Just. Servs., *Law Enforcement Handbook* (3d ed. 2015), https://www.bia.gov/sites/default/files/dup/BIA%20OJS%20Third%20Edition%20LE%2 0Handbook%202015%20_%20Approved%20Public%20Release%283%29.pdf (last visited Oct. 17, 2025. Adherence to the Handbook, or its minimum standards, is a condition for the Tribe's receipt of any federal law enforcement funding. 25 C.F.R. §§ 12.11 and 12.14.

58.    In addition, 25 C.F.R. § 12.12 sets forth both a requirement that law enforcement programs contracted by tribes meet minimum standards required and an obligation on the Department of Interior "to ensure compliance with minimum federal standards" and to ensure "a professional law enforcement program . . . ." 25 C.F.R. § 12.12.

59.    Furthermore, the ILERA states that the OJS is responsible for:

(1) the enforcement of Federal law **and, with the consent of the Indian tribe, tribal law**;

(2) in cooperation with appropriate Federal and tribal law enforcement agencies, the investigation of offenses against criminal laws of the United States; [and]

(3) the protection of life and property[.]

25 U.S.C. § 2802(c) (emphasis added).

**B.    The Tribal Law and Order Act of 2010**

60.    In 2010, Congress again reinforced the federal government's prior existing law enforcement duty owed to the Tribe when it enacted the TLOA, Pub. L. No. 111-211, Title II, July 29, 2010, 124 Stat. 2258 . In its findings, Congress acknowledged that "The United States has distinct legal, treaty and trust obligations to provide for the public safety of

19

Indian country." TLOA, § 202(a)(1).

61. Since 1990, the BIA has publicly explained its law enforcement actions and law enforcement budget requests as being "[i]n fulfillment of our treaty and trust responsibility." Opening statement of former OJS Director Jason O'Neil at BIA law enforcement consultation, May 2022.

62. In 2006, the BIA conducted a Gap Analysis, the purpose of which was to compare current law enforcement staffing "against a standard or benchmark, such as industry best practices, organizational strategic goals, or standards applied by federal regulation . . . ." "U.S. Department of the Interior, Bureau of Indian Affairs, Office of Law Enforcement Services Gap Analysis April 18, 2006" (hereinafter "Gap Analysis") at 1. The Gap Analysis concludes that 3.3 officer per 1,000 inhabitants of rural areas under 10,000 is the minimum required to meet federal law enforcement obligations. *Id.* at 3.

63. Congress also stated that three of the primary purposes of the TLOA Act were "to empower tribal government with the authority, resources, and information necessary to safely and effectively provide public safety in Indian country; . . . to reduce the prevalence of violent crime in Indian country and to combat sexual and domestic violence against American Indian and Alaska Native women; [and] to prevent drug trafficking and reduce rates of alcohol and drug addiction in Indian country." TLOA, § 202(b)(3).

64. TLOA requires the BIA to report annually to Congress on the unmet needs of law enforcement in Indian Country. TLOA § 211(b)(16)(C), 25 U.S.C. § 2802(c)(16)(C). This in turn requires the BIA to determine what the minimum "need" is to provide "basic" law enforcement. In fact, the BIA's 2011-2020 TLOA-mandated reports to Congress actually each contain statements defining that "need" for a "basic program" as 2.8 officers per 1,000

persons.  *See, e.g.,* "Report to the Congress on Spending, Staffing, and Estimated Funding

Costs for Public Safety and Justice Programs in Indian Country, 2020" (hereinafter "2020

OJS TLOA Report") at 5.

65.    The 2.8 officers per 1,000 service population standard was based upon the BIA's adoption

of the U.S. Department of Justice's Uniform Crime Data collected from comparable rural

areas of 10,000 or less (which, unlike the Tribe, do not have excessive crime or excessive

distance between police calls) and is inexplicably lower than the Gap Analysis' conclusion

that 3.3 officer per 1,000 is the minimum required.  Gap Analysis  at 3.

66.    On November 8, 2023, during a Technical Assistance meeting between Defendants and the

Tribe, which was held to fulfill Defendants' obligations pursuant to the District of South

Dakota Court's Order on the Tribe's Motion for a Preliminary Injunction in *Oglala Sioux*

*Tribe v. United States*, No.  22-cv-05066-RAL (May 23, 2023), OJS confirmed that the 2.8

per 1,000 persons standard is in fact the standard OJS uses to determine a tribe's need for

funding.

**C.    The Indian Self-Determination and Educational Assistance Act of 1975 (ISDEAA)**

67.    The ISDEAA, Pub. L. No. 93-638, Title I, Jan. 4, 1975, codified as amended 25 U.S.C. §

5321, *et seq*., authorizes the federal government and Indian tribes to enter into contracts in

which the tribes supply federally funded services, including law enforcement services, that

a federal government agency would otherwise provide.  *See* 25 U.S.C. §§ 5302(b), 5321(a).

In enacting the ISDEAA, Congress "recognize[d] the obligation of the United States to

respond to the strong expression of the Indian people for self-determination by assuring

maximum Indian participation in the direction of educational as well as other Federal

services to Indian communities so as to render such services more responsive to the needs and desires of those communities." *Id.* § 5302(a).

68. Congress further declared "its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." *Id.*, § 5302(b).

69. Section 106 of the ISDEAA, 25 U.S.C. § 5325(a)(1), provides that the "amount of funds provided under the terms of self-determination contracts" "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract . . . ." The amount of funds that the "Secretary would have otherwise provided" for adequate law enforcement is no less than the amount than the Secretary is required to expend under the Tribe's Treaties, the ILERA and TLOA.

70. Section 102 of the ISDEAA, 25 U.S.C. § 5321(a)(2), imposes explicit requirements. The Secretary is *directed* to enter into the proposed contract unless, upon review, the Secretary's objection to the proposal falls within one of only five statutory reasons allowed for declination. The law requires the following Secretarial action: "[t]he Secretary shall, within ninety days after receipt of the [tribe's] proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by controlling legal

authority that" one of the five statutorily permitted reasons for declination exists. 25 U.S.C. § 5321(a)(2).

71. The implementing regulations at 25 C.F.R. § 900.29(a) require that the Secretary's finding must be accompanied by "a detailed explanation of the reason" why one or more of the declination criteria exists and the "documents relied on in making the decision[.]"

72. Section 102 of the ISDEAA and the implementing regulations at 25 C.F.R. 900.18 are specific about the consequences for the Secretary not complying with the statutory declination requirements within 90 days of receipt of a tribal proposal. The consequences are that the Secretary is required, as a matter of law, to: (1) approve the Tribe's proposed contracts and approve the Tribe's proposed Annual Funding Agreements (hereinafter "AFAs"); (2) award the amended contracts and the new AFAs as proposed; and (3) add to the contract the full amounts of Title I funds pursuant to section 106(a)(1) of the ISDEAA (the amount the Secretary would have spent to comply with the federal government's treaty and trust responsibilities.). 25 U.S.C. § 5321(a)(2).

73. Each provision of ISDEAA (and other federal statutes involving Indians) shall be liberally construed for the benefit of the Tribe. *See* 25 U.S.C. § 5321(g).

### IV. Law Enforcement on the Pine Ridge Reservation and the Consequences of the Defendant's Failures

74. At roughly 3.1 million acres, the Oglala Sioux Tribe's Pine Ridge Reservation is larger than the states of Rhode Island and Delaware combined.

75. Among the people who reside on or conduct business on the Reservation are Oglala Sioux Tribal members, non-member Indians, and non-Indians who reside on or enter the reservation on a regular basis, all of whom are dependent on federally funded BIA law

enforcement officers to protect them and their on-reservation property.  These individuals comprise the law-enforcement service population of the Reservation.

76.    By letter to the Tribe dated July 21, 2023, the U.S. Department of Justice advised the Tribe that, "In March 2023, the Office of Justice Services ("OJS") updated OST's service population from 32,152 to 45,697, based on information OST submitted to the Office of Indian Services in 2021."  On November 8, 2023, Defendant OJS reported to the Tribe that as of 2023, OJS is now using total Tribal enrollment as a tribe's service population but admitted that the total enrollment of a tribe does not equate to the actual number of people served by law enforcement on a reservation.

77.    The BIA's own standard of providing 2.8 officers per 1,000 people is the minimum required by the United States to provide the Tribe with adequate and effective law enforcement pursuant to the 1825, 1851, and 1868 Treaties and the duty Defendants owed to the Tribe as carried forward from the Treaties in both the ILERA and the TLOA.

78.    Applying the BIA's 2.8 officers per 1,000 persons standard to the actual Pine Ridge service population, with an OJS-estimated law enforcement service population of 53,697 individuals, requires that the Tribe have a minimum of 128 police officers.  Applying the standard to the total Tribal enrollment of 53,590 individuals as of June 1, 2025, requires that the Tribe have a minimum of 150 police officers.

79.    The United States currently only provides enough funding to employ 33 police officers and 8 criminal investigators to cover the 45,697 OJS-estimated law-enforcement service population. This equates to only 6-8 officers per shift.  This is less than .8 officers per 1,000 persons in the OJS-estimated service population of 45,697, and less than .7 officers per 1,000 persons in the total Tribal enrollment of 53,590 as of June 1, 2025.

80. The lack of adequate law enforcement officers causes extraordinary danger to the law enforcement officers who are working unreasonable amounts of overtime, patrolling alone, and responding to dangerous calls for service without proper backup.

81. The lack of adequate law enforcement has had and is continuing to have serious consequences for the Tribe and its citizens, including but not limited to:

   A. In 2021, there were 133,755 E-911 calls for service on the Pine Ridge Reservation. These 2021 calls for services included 794 calls involving an assault, 1,463 domestic violence calls, 522-gun related calls, 541 drug/narcotic calls, and calls reporting 541 missing persons, most of which required immediate attention to protect life, health, and safety.

   B. In FY 2023 (October 1, 2022, to September 30, 2023), there were 165,799 E-911 and telephone calls to OST DPS seeking law enforcement assistance on the Pine Ridge Reservation. These included 1,133 calls involving an assault, 1,245 domestic violence calls, 589 gun-related calls, 343 drug/narcotic calls, and 339 child abuse/neglect calls, most of which required immediate attention to protect life, health, and safety. In addition to dispatch fielding a record number of gun-related calls, officers confiscated 133 rifles and handguns. Dispatch recorded 653 calls for missing persons, also a record number.

   C. Many E-911 calls for police service are abandoned, are not being responded to in the time required to ensure public safety or are not being properly investigated or prosecuted because there simply are not enough police officers.

   D. The volume of E-911 calls, combined with an inadequate number of police officers, is forcing police officers to drive from call to call at high speeds, endangering both the

officer and the public.

E.  Police response time often exceeds 30 minutes, even in cases of domestic violence, gun activities, and other imminent threats of harm.  This can and often does add to the harm suffered by crime victims on the Reservation.

F.  Police officers operate alone, with backup often being over 30 miles away, even in calls involving guns or weapons. Thus, police officers are often placed in unnecessary danger.

G.  Crimes are not timely or adequately investigated, and witness statements and other evidence are not collected promptly, thereby endangering federal and tribal prosecutions and convictions.

H.  On-reservation deaths, homicides, drug sales, police-involved accidents, and overdoses have increased significantly since 1999.

I.  Law enforcement officers and criminal investigators are being called to work an unreasonable amount of overtime and work multiple shifts, with inadequate sleep or downtime. This, too, is endangering both the officers and the public.

82.  Tribal citizens are often scared to venture out of their homes at night, especially because gunshots are heard throughout the reservation on a frequent and re-occurring basis.

83.  As a result of the lack of adequate law enforcement, on November 18, 2023, Tribal President Frank Star Comes Out issued a Proclamation declaring a State of Emergency on the Reservation.

84.  The Tribe itself is negatively impacted by the lack of law enforcement services. Negative impacts include, but are not limited to:

26

A. The Tribe operates numerous tribal on-reservation schools, health facilities, Tribal programs, and several Tribally owned businesses whose safe operation is compromised by the lack of law enforcement services.

B. Some families no longer feel safe sending their children to school, especially without School Resource Officers present. Some students also feel unsafe on school grounds because of the gang violence on the Reservation, which often involves other juveniles, and the lack of law enforcement services to respond to threats.

C. Tribal health care costs have increased because of the increased number of overdoses and injuries sustained from assaults, domestic violence and other crimes.

D. The Tribal economy is negatively impacted as new businesses are not attracted to high crime areas. The businesses that are located on the reservation must spend additional funds to protect their employees and property. Some have even chosen not to remain open at night. This results in additional hardships for Reservation residents and those businesses.

85. These impacts and consequences are the result of the Defendants' failure to uphold their Treaty, statutory and trust obligations to provide effective law enforcement on the Reservation.

86. The crisis in law enforcement created by Defendants' failure to adequately fund law enforcements services on Pine Ridge, or to deploy additional federal resources, is and has been escalating for years.

## V. The Tribe's Base Law Enforcement Funding under the ISDEAA

87. The public safety commitments that the federal government made in the 1825 Treaty, the 1851 Treaty, and Articles I & V of the 1868 Treaty; the promises to protect each Tribal individual's right to "property, person, and life" Congress made in the 1877 Act; and the

27

minimum required to meet that commitment articulated by its adoption of the DOJ's Uniform Crime Data average as its national Indian law enforcement standard (and utilizing that standard in its 2011-2019 TLOA reports to Congress) establish a direct relationship between the number of E-911 calls made on the Pine Ridge Indian Reservation and the number of law enforcement officers needed to answer those complaints in an effective manner. Defendants currently are failing to meet that standard in providing law enforcement at the Pine Ridge Reservation.

88.  In fact, currently the BIA has no treaty, trust, or needs-based method for determining the base amount of law enforcement it should be providing to the Tribe.

89.  Prior to 1998, BIA unilaterally chose to provide tribes with their BIA law enforcement funding through a process called the Tribal Priority Allocation System ("TPA"). TPA is a budget allocation system that provides a tribe with a lump sum of money derived from combining the federal appropriations from a variety of BIA programs. Once these funds are combined, the TPA system allows a tribe to allocate its share of those funds to a predetermined list of BIA functions, i.e., tribal government operations, human services, child welfare, and (until 1999) law enforcement.

90.  In the late 1990's, the DOJ had started making it easier for tribes to apply for and receive short term, highly specific, law enforcement grants from that agency. As DOJ started to provide this short-term funding for law enforcement activities, the Tribe's dependence on the BIA's law enforcement monies, which were at the time being deposited into that lump sum TPA account, decreased temporarily and the Tribe was able to divert more TPA monies into other pressing areas of need, such as social services.

91.  Starting in 1998, DOJ offered the Tribe a short-term demonstration program to help better

address crime and public safety problems.  This DOJ grant was called the Comprehensive Indian Resources for Community and Law Enforcement ("CIRCLE"). This DOJ effort was expanded when the Tribe was awarded other CIRCLE related DOJ funding from its Community Oriented Policing Services (COPS) program and other DOJ funded programs.

92.   The Tribe applied for and accepted these CIRCLE and COPS funds with the full encouragement of both BIA and DOJ, and with the understanding that BIA would absorb the costs of those additional law enforcement positions when the grants ran out.  In fact, DOJ, as a condition to awarding the grant, required the Tribe to articulate who would cover the costs of the COPS-funded officers after the COPS grant expired. BIA and DOJ were fully aware that the Tribe stated in its grant applications that the cost of those officers would be absorbed by the BIA's law enforcement program.

93.   Instead, in calendar year 2006, the BIA requested and received funding to begin absorbing some of those tribal officers at other locations whose costs were then funded by DOJ COPS grants, and which were slated to expire.  FY 2006 Budget Justification, United States Department of the Interior, BIA at BIA-SUM-13 Then in 2007, the BIA advised the Congress that "The Bureau is currently pursuing an MOU with the DOJ COPS office to address expiration of grants and the distribution of grants for new resources."  FY 2007 Budget Justification, United States Department of the Interior, BIA at PSJ-4.  The additional officers that the DOJ had been funding at the Pine Ridge Reservation were never absorbed by the BIA.

94.   These COPS grant has been funding more than 50 additional law enforcement officers at the Pine Ridge Reservation and reduced on-reservation crime for the five-year period that they were in effect.

95.   Thus, short term grants from DOJ were funding a significant percentage of the police force on the Pine Ridge Reservation in 1999-2006.

96.   In 1998-1999, BIA unilaterally decided to move all its law enforcement funding out of the TPA funding system and re-established that funding as the budget for a separate OJS-operated law enforcement program.

97.   The Tribe was not, at first, worried about this because it had a full police force funded by the Defendant, United States, mostly from DOJ, and understood that the costs for those Oglala law enforcement positions funded by the DOJ would be absorbed by the BIA and added to its base budget when those COPS grants expired.  However, the BIA did not absorb the costs for the COPS-funded  law enforcement positions once the COPS grants expired.

98.   The BIA not only failed to provide funding for the costs of Those DOJ funded law enforcement positions, but it also chose to treat the amount of funding that the Tribe took out of its TPA allocation for law enforcement in 1999 (when those DOJ funds were already funding more than 50% of its tribal officers,) as the Tribe's new base budget for all OJS law enforcement activities from that point forward.

99.   The BIA knowingly established the Tribe's base law enforcement budget from 1999 to the present using an amount that BIA knew was artificially low due to the fact that the Tribe had been temporarily receiving CIRCLE and COPS grant funding to pay for over 50% of its law enforcement needs.

100.  When the BIA failed to adjust the Tribe's base budget to fully accommodate the loss of those short-term DOJ-funded officers, BIA ignored its treaty and trust duties and the role that those DOJ CIRCLE, COPS, and the other DOJ short term programs were temporarily

playing in the fulfillment of the federal government's trust and treaty responsibilities to the Oglala Sioux Tribe.

101.    This single, arbitrary BIA decision, which it continues to repeat annually, results in BIA's base funding for law enforcement services on the Pine Ridge Reservation remaining arbitrarily low, causing Defendants to remain out of compliance with their duties created in the 1825, 1851, and 1868 Treaties and reinforced/defined in BIA's minimum standards and subsequent federal statutes.

102.    The BIA has not adjusted the base calculation of the Secretarial amount for the Tribe's law enforcement funding since 1999, despite the fact that the Tribe has added new residents and businesses, expanded its programs and services, and added new housing.

103.    The current BIA base funding has no relationship to the Tribe's actual need for law enforcement services and fails to uphold the federal government's Treaty duties of providing effective law enforcement to the Tribe on the Reservation.  In fact, the BIA has no methodology to award its base funding based upon current need.

104.    By continuing to assign base funding amount to the Tribe based upon the Tribe's 1999 TPA law enforcement budget the BIA continues to act in an arbitrary and capricious manner, and such ongoing actions continue to have deadly consequences.

**VI.    Notice to Defendants of the United States' Failure to Fulfil Law Enforcement Treaty Obligations**

105.    The Tribe has repeatedly reminded the federal government of its Treaty and trust law enforcement obligations and has informed Defendants of its 1999-based funding errors in meetings with DOI, OJS, and the White House, yet the problems remain unaddressed.

106.    The Tribe has met with federal officials in BIA, OJS and the Department of the Interior repeatedly to notify the Defendants of the rampant unaddressed shortfalls in law

enforcement funding, the resulting crimes and related impacts occurring on the Reservation, and to request the Defendants to fulfill their Treaty and statutory obligations.

107.    The Tribe has also placed both monthly crime and drug violation reports into the federal National Incident-Based Crime Reporting System ("NIBRS"), a software database operated by the OJS in conjunction with the Federal Bureau of Investigation for many years.  These reports, that show the volume and types of demands for police services that are received at the Pine Ridge Reservation, are available to all Defendants.

108.    Additionally, BIA Superintendent Douville receives regular in-person or telephonic reports from the Tribal Council about the on-reservation public safety crisis on the Pine Ridge Reservation. The Superintendent also receives information on current on-reservation crimes when attending or listening to the Oglala Sioux Tribal Council and its Tribal Law and Order Committee meetings, which are regularly broadcast on the local KILI Radio Station and online.

**VII.    Current Violations of the Indian Self Determination and Education Assistance Act**

109.    Under ISDEAA, the Secretary is directed "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer" programs, services, functions, and activities administered by the Secretary. 25 U.S.C. § 5321(a)(1).

110.     ISDEAA also requires that the "amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract…."  25 U.S.C. § 5325(a)(1).  For the Tribe, this is the amount required to fulfill the Secretary's duties of providing adequate law enforcement services under the  Treaties, the ILERA, and the TLOA.

111.   ISDEAA requires that "[i]n the negotiation of contracts and funding agreements, the Secretary shall—

(1) at all times negotiate in good faith to maximize implementation of the self-determination policy; and

(2) carry out this chapter in a manner that maximizes the policy of Tribal self-determination[.]"  25 U.S.C. § 5321(f).

112.   ISDEAA also provides that "[t]he amounts of such contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."  25 U.S.C. § 5324(c)(2).  The Secretary may decline a contract only after providing the Tribe with:

> written notification . . . that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that:
>
> (1) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (2) adequate protection of trust resources is not assured;
>
> (3) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> (4) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 5325(a) of this title; or
>
> (5) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2).

113.   The Tribe has, for over 40 years, contracted with the Secretary under ISDEAA to administer the Secretary's exclusive law enforcement duties owed to the Tribe on the

Reservation and has consistently complained about the inadequate contract amount the government was offering.

114.    On July 19, 2024, the BIA OJS received the two ISDEAA contract proposals for FY 2025 the Tribe had submitted for its Law Enforcement (hereinafter "LE") and Criminal Investigation (hereinafter "CI") programs.

115.    On July 23, 2024, the BIA OJS acknowledged receipt of the FY 2025 LE and CI proposals, and on September 3, 2024 sent two initial review letters to the Tribe, one for each proposal, outlining areas potential declination for each proposal.  Six weeks later, on October 17, 2024, Defendant Terry McCloud issued two separate declination letters for the FY 2025 LE and CI contract proposals, one for each proposal.

116.    In the October 17, 2024 LE contract proposal declination letter, the BIA OJS indicated its understanding that the Tribe "requests base funding in the amount of $31,113,583.13 for each fiscal year of the proposed contract term, in addition to direct and indirect support costs ("CSC"), and pre-award and start-up costs.  Additionally, the LE Proposal requests the addition of new, or expansion to, the PFSAs currently contracted by the Tribe, which include: 1) School Resource Officer ("SRO"); 2) "Fully Equipped Canine Teams"; and 3) an Internal Affairs Office functions that the Tribe has not previously performed under its existing contract."

117.    The BIA OJS partially declined the LE contract proposal, citing 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. 900.22(d), and partially approved the Tribe's funding request, determining that $4,258,510 was the "Secretarial base funding amount" and approved only that portion of the contract proposal "as a successor contract for FY2025 <u>under the same terms,</u>

conditions, and funding as authorized in the FY2023 AFA, as extended through FY2024."
(Emphasis in original.)

118.  The letter noted that the "Tribe's LE Proposal includes Secretarial amounts from the previous FY2023 and FY2024. The Tribe has already received the Secretarial amount for these two (2) fiscal years. . . . The BIA OJS previously approved ISDEAA contract funding amounts through successor annual funding agreements (SAFAS) awarded through the on-going contract (No. A20AV00269) for FY2023 and FY2024. The Tribe has already been allocated and awarded the full Secretarial amount for those years. . . . The BIA OJS declines the portion of the LE Proposal that requests base funding for FY2023 and FY 2024 because this funding is in excess of the Secretarial amount (i.e., the applicable funding level) under 25 U.S.C. 5321(a)(2)(D) and 25 C.F.R. 900.22(d) and the Secretarial Amount for FY2023 and FY2024 has been allocated and awarded to the Tribe."

119.  With respect to FY 2025, the letter noted that the "Tribe 's LE Proposal requests a base funding amount of $31,133,583.13 for the LE Program which is $26,875, 073.13 in excess of the Secretarial amount for the LE Program for the Tribe. . . . As reflected in the Tribe's current approved Annual Funding Agreement ("AFA") for FY2023, extended on same terms and funding amount for FY2024, the Secretarial  funding amount available for the LE Program is $4,258,510. This is the anticipated amount of ongoing base law enforcement funding the Tribe can expect to receive through a successor contract for FY2025. The Secretarial amount is the amount allocated from the annual lump-sum appropriation for the Operation of Indian Programs that the Secretary would have otherwise provided for the operation of the Tribe's LE Program for the period covered by the proposed contract. The Secretary's allocation is reflected in the tables attached to the Interior's Budget Justification,

35

also known as the Greenbook. . . . The BIA OJS declines the portion of the LE Proposal that requests base funding for FY2025 that is in excess of the Secretarial amount under 25 U.S.C. 5321(a)(2)(D) and 25 C.F.R. 900.22(d)."

120.    The BIA OJS declined the portion of the Tribe's FY 2025 LE contract proposal seeking to add the SRO function, citing 25 U.S.C. § 5321(a)(2)(A), (C), and (D) and 25 C.F.R. 900.22(a), (c), & (d).  The letter noted that the "The Tribe proposes adding a SRO function but does not identify the funds requested from the local, area, regional, or national level under 25 C.F.R. 900.8(h)(1). Nor, pursuant to § 900.12, does it identify a specific amount requested for this new function. The BIA OJS does not have an SRO function specifically for the Tribe and has not allocated a contractible amount of funds that the Tribe could use to carry out this new function in a satisfactory manner or in a way that it could be properly maintained. The service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of funding potentially allocable to the Tribe would not adequately meet the staffing, training, and relationship requirements of the SRO function. . . . The BIA OJS declines the portion of the LE Proposal for an SRO function under 25 U.S.C. § 5321(a)(2)(A), (C), & (D) and 25 C.F.R. 900.22(a), (c), & (d)."

121.    The BIA OJS declined the portion of the Tribe's FY 2025 LE contract proposal seeking to add Fully Equipped Canine Teams, citing 25 U.S.C. § 5321(a)(2)(A), (C), & (D) and 25 C.F.R. 900.22(a), (c), & (d).  The letter noted that the " Tribe proposes to add new "Fully Equipped Canine Teams" function and an expanded law enforcement program but does not identify the funds requested for the new and expanded PFSAs from the local, area, regional, or national level under 25 C.F.R. section 900.8(h)(1). Nor, pursuant to Section 900.12, does it identify a specific amount of funding for these new functions. The BIA OJS does not

36

operate a canine team function specifically for the Oglala Sioux Tribe and has not allocated a contractible amount of funds that the Tribe could use to carry out this new function in a satisfactory manner or in a way that it could be properly maintained. . . .  Because of the nature of the canine program operated by OJS, the function cannot be properly maintained by the proposed contract because it would serve only a single reservation instead of providing broad service to the areas of Indian Country of highest potential for drug interdiction. Furthermore, the service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of funding potentially allocable to the Tribe would not adequately meet the requirements of a canine law enforcement officer. . . . The BIA OJS declines the portion of the LE Proposal for the "Fully Equipped Canine Teams" function under 25 U.S.C. 5321(a)(2)(A), (C), & (D) and 25 C.F.R. 900.22(a), (c), & (d). Pursuant to 25 U.S.C. 5325(o), however, the Tribe may, with respect to allocations within the approved budget of the contract, re-budget and redesign the LE Program to add a "Fully Equipped Canine Teams" function provided that such re-budgeting would not have adverse effect on the performance of the contract.

122.  The BIA OJS declined the portion of the Tribe's FY 2025 LE contract proposal seeking to add an Internal Affairs Office function, citing 25 U.S.C. 5321(a)(2)(A), (C), & (D) and 25 C.F.R. 900.220), (c), & (d).  The letter noted that the "Tribe's proposal requests a new Internal Affairs Office function, including, a reporting system that would "allow[] any individual who interacts with any federal or tribally funded law enforcement officer . . .to report suspected or alleged officer misconduct[.]" The proposal provides that the Contractor is authorized to conduct a simultaneous or subsequent civil rights internal investigation. However, pursuant to Section 900.8(h)(1), the proposal does not identify the

37

funds requested for each new or expanded program under 25 U.S.C. 5321 (a)(l) from the local, area, regional, or national level. Nor, pursuant to Section 900.12, does it identify a specific amount of funding for these new functions. The BIA OJS operates a nationwide Internal Affairs program for the benefit of all tribes but does not operate an Internal Affairs function on Pine Ridge and does not have a contractible amount of funds from the nationwide program, otherwise known as 'tribal shares' that the Tribe could use to carry out this new function in a satisfactory manner or in a way that it could be properly maintained. Because of the nature of the Internal Affairs program operated by OJS, the function cannot be properly maintained by the proposed contract because it would serve only a single reservation instead of providing broad service to the areas of Indian Country with matters requiring investigation. Furthermore, the service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of funding potentially allocable to the Tribe would not adequately meet the requirements of a specialized investigative unit separated from the tribal police department's chain of command. . . . The BIA OJS declines the portion of the LE Proposal that requests new and expanded Internal Affairs Office function under 25 U.S.C. 5321(a)(2)(A), (C), & (D) and 25 C.F.R. 900.220), (c), & (d). Pursuant to 25 U.S.C. 5325(0), however, the Tribe may, with respect to allocations within the approved budget of the contract, re-budget and redesign the LE Program to add Internal Affairs Office function provided that such re-budgeting would not have adverse effect on the performance of the contract."

123.   The BIA OJS declined the portion of the Tribe's FY 2025 LE contract proposal seeking increased Direct Contract Support Costs, citing 25 U.S.C. 5321(a)(2)(D) and 25 C.F.R. 900.22(d). The letter noted that the "Tribe 's LE Proposal requests Direct Contract Support

Costs (CSC) be paid in the amount of 33.01 percent of the tribal salaries which is in excess of the applicable funding level for the contract. . . . Under the ISDEAA, section 5325(a)(2) & (3), the BIA OJS is authorized to reimburse the Tribe for the reasonable and allowable direct program expenses associated with the operation of the contracted program. The Tribe's request for Direct CSC in the amount of 33.01 percent of tribal salaries appears to be based on a calculation error-specifically on the failure to account for caps on the per employee cost of state unemployment tax and workers' compensation. As explained in correspondence to the Tribe's lawyers dated December 19, 2023, the BIA OJS has analyzed information provided by the Tribe showing the actual fringe associated with this contract for FY 2023. The BIA has determined that its current policy of paying Direct CSC based on 18 percent of tribal salaries more than adequately reimburses the Tribe for its reasonable and allowable Direct CSC. . . . The BIA OJS declines the portion of the LE Proposal for Direct CSC in excess of 18 percent of Tribal salaries under 25 U.S.C. 5321(a)(2)(D) and 25 C.F.R. 900.22(d)."

124.    Finally, the BIA OJS declined the portion of the Tribe's FY 2025 LE contract proposal seeking definite increases in the base funding amount for each subsequent year, citing 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. 900.22(d).  The letter noted that the "Tribe 's LE Proposal requests that the base amount of direct program funds provided shall be increased by 'not less than' 3.5 percent for each subsequent fiscal year, including a 3.5 percent increase in the salaries of all Tribal employees. This proposed increase in base amount funds and salary increase equate to an amount that is in excess of the Secretarial amount. . . . The BIA OJS does not have new or additional funds that may be allocated to the Tribe and must decline increases that exceed the applicable funding level for the Tribe's LE

Program. The base funding amount identified in both the FY2023 AFA, and as extended through FY2024, in which full funding was awarded in the contract for each year for the Tribe's LE Program is $4,258,510. The increases requested in your LE Proposal would result in an amount in excess of the amount of funds that the BIA OJS would have otherwise provided to operate the Oglala Sioux Tribe's LE Program on the Pine Ridge reservation in future fiscal years. Under 25 U.S.C. 5325(a)(l) the BIA OJS is required to provide to the Tribe the same amount of funds that it would otherwise have to operate the program. However, in accordance with the Anti-Deficiency Act, 31 U.S.C. 1341, the BIA OJS is prohibited from obligating funds in advance of appropriations. . . . The BIA OJS declines the portion of the LE Proposal that requests base funding for FY2025 in excess of the Secretarial amount under 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. 900.22(d)."

125.    In the October 17, 2024 CI contract proposal declination letter, the BIA OJS indicated its understanding that "the Tribe's CI Proposal requests base funding in the amount of $5,058,352.96 for the CI program for each fiscal year of the proposed contract term, in addition to direct and indirect contract support costs ("CSC"), and pre-award and start-up costs.  Additionally, the CI Proposal requests the addition of new, or expansion to, the PFSAs currently contracted by the Tribe, which include: 1) Internal Affairs ("IA"); 2) Drug Enforcement ("DE"); and 3) Missing and Murdered Unit ("MMU") functions that the Tribe has not previously performed under its existing contract. Additionally, the CI Proposal seeks to change several terms concerning performance of the contract in the SOW."

126.    The BIA OJS partially declined the CI contract proposal, citing 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. 900.22(d), and partially approved the Tribe's funding request, determining that $1,419,503 was the "Secretarial base funding amount" and approved only that portion

of the contract proposal "as a successor contract for FY2025 <u>under the same terms,</u> <u>conditions, and funding</u> as authorized in the FY2023 AFA, as extended through FY2024." (Emphasis in original.)

127. The BIA OJS declined the portion of the Tribe's FY 2025 CI contract proposal seeking to add new and expanded functions, including a Missing and Murdered Indigenous Persons (MMIP) & Cold Case function. The letter noted that the "Tribe 's CI Proposal requests to add new, and expanded, Missing and Murdered Indigenous Persons (MMIP) and Cold Case Criminal Investigator, a Drug Investigator Criminal Investigator position, Internal Affairs Office function, additional Program Analyst positions, a Law Enforcement Assistant position, and an expanded CI PFSAs, but does not identify the funds requested for these new functions under Section 900.8(h)(l). . . . The Tribe proposes adding new, and expanded, PFSAs but does not identify the funds requested from the local, area, regional, or national level under 25 C.F.R. 900.8(h)(1). Nor, pursuant to Section 900.12, does it identify a specific amount requested for each new proposed function or program. The BIA OJS operates nationwide MMU, a nationwide Division of Drug Enforcement ("DDE"), and a nationwide IA Division, but it does not operate an MMIP & Cold Case function, a Drug Investigator Criminal Investigator position, and an IA function specifically for the Oglala Sioux Tribe on the Pine Ridge Reservation. In addition, BIA OJS has not allocated a contractible amount of funds from these nationwide programs, otherwise known as 'tribal shares,' that the Tribe could use to carry out these new functions and position in a satisfactory manner or in a way that it could be properly maintained. . . . The MMU function cannot be properly maintained by the proposed contract because it would serve only a single reservation instead of providing service to all of Indian Country, with specialized

resources available to address high-priority missing and murdered cases wherever they occur and centralized coordination with other federal law enforcement agencies. Additionally, the service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of funding potentially allocable to the Tribe would not adequately meet the requirements of a specialized investigative unit focused on missing and murdered cases across Indian Country. . . . The DDE function cannot be properly maintained by the proposed contract because it would serve only a single reservation instead of providing service to all of Indian Country, with resources available to address inter-reservation trafficking and centralized coordination with other federal law enforcement agencies. Additionally, the service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of funding potentially allocable to the Tribe would not adequately meet the requirements of a centralized, coordinated drug investigation unit focused on trafficking across Indian Country. . . . The IA function cannot be properly maintained by the proposed contract because the nature of the internal affairs program operated by OJS provides broad service to several tribes simultaneously and to respond to matters as they arise. Additionally, the service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of funding potentially allocable to the Tribe would not adequately meet the requirements of an internal affairs investigator, which must consist of a dedicated unit of at least one investigator and not as additional duties assigned to an existing investigator given the nature of the work."

128.    The BIA OJS declined the portion of the Tribe's FY 2025 CI contract proposal seeking definite increases in the base funding amount for each subsequent year, citing 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. 900.22(d).  The letter noted that the "Tribe 's CI Proposal

requests the base amount of direct program funds provided shall be increased by 'not less than' 3.5 percent for each subsequent fiscal year, including a 3.5 percent increase in the salaries of all Tribal employees. This proposed increase in base amount funds and salary increase are in excess of the Secretarial amount. . . . The BIA OJS does not have new or additional funds that may be allocated to the Tribe and must decline increases that exceed the applicable funding level for the Tribe's CI Program. The base funding amount identified in both the FY2023 AFA, and as extended through FY2024, in which full funding was awarded in the contract for each year for the Tribe's CI Program is $1,419,503. The increases requested in your CI Proposal would result in an amount in excess of the amount of funds that the BIA OJS would have otherwise provided to operate the Oglala Sioux Tribe's CI Program on the Pine Ridge reservation in future fiscal years. Under 25 U.S.C. 5325(a)(1) the BIA OJS is required to provide to the Tribe the same amount of funds that it would otherwise have to operate the program. However, in accordance with the Anti-Deficiency Act, 31 U.S.C. 1341, the BIA OJS is prohibited from obligating funds in advance of appropriations."

129.  Finally, the BIA OJS declined the portion of the Tribe's FY 2025 LE contract proposal seeking increased Direct Contract Support Costs, citing 25 U.S.C. 5321(a)(2)(D) and 25 C.F.R. 900.22(d).  The letter noted that the "Tribe 's CI Proposal requests Direct Contract Support Costs ("CSC") be paid in the amount of 33.01 percent of the tribal salaries which is in excess of the applicable funding level for the contract. . . . Under the ISDEAA, section 5325(a)(2) & (3), the BIA OJS is authorized to reimburse the Tribe for the reasonable and allowable direct program expenses associated with the operation of the contracted program. The Tribe's request for Direct CSC in the amount of 33.01 percent of tribal salaries appears

to be based on a calculation error-specifically on the failure to account for caps on the per employee cost of state unemployment tax and workers' compensation. As explained in correspondence to the Tribe's lawyers dated December 19, 2023, the BIA OJS has analyzed information provided by the Tribe showing the actual fringe associated with this contract for FY 2023. The BIA has determined that its current policy of paying Direct CSC based on 18 percent of tribal salaries more than adequately reimburses the Tribe for its reasonable and allowable Direct CSC. . . . The BIA OJS declines the portion of the CI Proposal for Direct CSC in excess of 18 percent of Tribal salaries under 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. 900.22(d).

130. The October 17, 2024 FY 2025 LE and CI contract proposal partial declination letters failed to consider: (1) the number of calls for assistance to OST DPS (1868 Treaty "complaints") received on the Pine Ridge Reservation; (2) the crime and drug numbers provided by the Tribe's monthly law enforcement reports; (3) the unreasonableness of having 33 police officers respond to over 160,000 emergency calls per year across 5,400 square miles of the Reservation; (4) the federal government's statutory duties and obligations under the ILERA and the TLOA; (5) the United States' 1825, 1851, and 1868 Treaty obligations and its trust responsibilities to the Tribe; (6) the BIA's minimum required law enforcement coverage of 2.8 officers per 1,000 service population; or even (7) the law enforcement issues that the Oglala Sioux Tribe has consistently raised in meetings with OJS and DOI representatives for over 24 years.

131. The partial declinations were also arbitrary and capricious for the following reasons:

(1) the Tribe proposed carrying out only those DDE (including K-9 units), SRO, IA, and MMU contractible functions that are local in nature and would not interfere with the

activities DOI is performing at a regional or national level; (2) the Tribe is currently performing federally funded drug enforcement, murder investigation, and missing persons functions and operating K-9 units under its existing ISDEAA LE and CI contracts, but the Tribe needs additional staff and funding to meet the increased case load for these responsibilities; (3) BIA OJS has admitted that it has funded SRO positions for direct funded service tribes for some BIE schools in 2022 and in 2023, proving it has SRO funding; (4) OJS has received appropriations from Congress specifically for the SRO, DDE (including K-9 units) and MMU programs for FY 2023 by continuing resolution; and (5) the Tribe has existing K-9 units funded with one-time OJS allocations of funds but needs additional funds for additional units.

132.    Any decision to fund direct services tribe SRO positions and not ISDEAA contracted law enforcement contracts for these positions is arbitrary and not in accordance with the requirements of 25 U.S.C. § 5321(a)(1) or (2) which establish that the function is contractible and that do not provide discretion to the Secretary to fund one tribe but not another tribe for SRO positions.

133.    BIA OJS's decision not to include SRO funding as a delegable duty and not to fund additional officers and investigators also ignores the increased number of firearms Tribal police have taken from juveniles in the last year, the gang related violence involving juveniles, and the threats that exist in all K-12 schools from active shooters in this country. It also ignores the federal government's existing obligation to address the other criminal activities taking place at on-reservation schools, including, but not limited to the following: weapons possession, theft, violence and threats of violence, suicide attempts, and the use of dangerous substances that are not federally banned.

134.   Although the BIA OJS operates its own federally operated DDE (including K-9) and MMU Units in South Dakota, those units are located over eighty (80) miles away in Rapid City and rarely respond to drug cases or MMU cases on the Reservation.

135.   The OST DPS is already primarily responsible for responding to MMU cases occurring on the Pine Ridge Reservation.  The OJS MMU did not assist with any missing persons cases on the Pine Ridge Reservation and denied one request for assistance from the OST DPS in FY 2023.

136.   The OST DPS is already conducting its own drug enforcement operations and is required to be involved with all OJS DDE operations conducted on the Pine Ridge Reservation.

137.   The OJS DDE has on at least one recent occasion failed to coordinate with the OST DPS in its planned operations, resulting in the operation being rescheduled.

138.   In reviewing the Tribe's ISDEAA positions in this case, each provision of ISDEAA "shall be liberally construed for the benefit of the [Tribe]." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012) (*quoting* 25 U.S.C. § 5329(c) (Model Agreement § 1(a)(2)). "The Government, in effect, must demonstrate that its reading is clearly required by the statutory language." *Id.*

139.   As a result of the actions and failures to act described herein, the Tribe has been and continues to be harmed.

140.   The Tribe has exhausted all of its administrative remedies in this matter.

## FIRST CLAIM FOR RELIEF

### Violation of Treaty, Statutory, and Trust Duty: The United States' Failure to Provide Adequate and Effective Law Enforcement Services

141.   The Tribe realleges the preceding paragraphs and incorporates them by this reference.

142.   By proposing, incorporating, and ratifying  the 1825 Treaty, the 1851 Treaty, and the 1868

Treaty, and imposing federal criminal jurisdiction and federal law enforcement responsibility on the Pine Ridge Reservation, the United States obligated itself to provide a sufficient number of properly equipped law enforcement officers and criminal investigators on the Pine Ridge Reservation to ensure the timely investigation and reporting of all crimes, and the arrest and punishment of all offenders who violate federal law or otherwise threaten or harm the Tribe or its property, or the person or property of any tribal member.

143.    This federal commitment was part of the explicit bargain exchanged for the Tribe curtailing its sovereign authority and practical ability to deal with criminal acts as it had been for centuries, to allow open passage thru Tribal lands and a guarantee of peace.  It is the foundation of the trust obligation owed by Defendants to the Tribe to provide adequate and effective law enforcement services.

144.    Today, as in 1825, 1851, and 1868, the Pine Ridge Reservation remains under federal criminal jurisdiction and law enforcement authority.  Today, as in 1877, this federal commitment is necessary to ensure the Tribe an orderly government and to ensure the safety of persons and property on the Pine Ridge Reservation.

145.    Pursuant to the 1825, 1851 and 1868 Treaties, the 1877 Act, the 1921 Snyder Act, the 1990 ILERA, and the 2010 TLOA, Defendants have a specific, special statutory and trust duty to provide adequate and effective law enforcement services to the Tribe and its members and promptly and diligently investigate and report crimes and immediately arrest and punish offenders.

146.    Having bargained for in Treaties and undertaken federal responsibility for law enforcement services on the Pine Ridge Reservation, the United States has a Treaty and trust obligation

to provide to the Tribe and its members sufficient law enforcement services to provide for adequate and effective law enforcement.

147. The mechanism through which this Treaty and trust obligation has been implemented since shortly after the enactment of the ISDEAA, has been, pursuant to that Act, to contract with Tribe for the Tribe to perform the law enforcement responsibilities and functions of the Secretary, the Bureau of Indian Affairs and the Office of Justice Services, and to provide the Tribe with funding equal to the amount that would be spent by the Secretary to directly provide such functions in compliance with the United States' Treaty and trust obligations.

148. The Defendants have implemented that program in such a manner as to make performance these Treaty and trust obligations unobtainable on the Pine Ridge Reservation. The Defendants' decisions not to increase the base funding for the Tribe's CI and LE contracts have made it impossible for the United States to fulfill its Treaty and trust obligations to the Tribe and to its members on the Reservation.

149. The Defendants have breached and continue to breach their Treaty obligations under the 1825, 1851, and 1868 Treaties and their trust duty to the Tribe and its members by providing law enforcement services to the Tribe at levels that fall substantially below the levels necessary for the effective law enforcement that is required by Articles I and V of the 1868 Treaty, the 1851 Treaty, the duty of protection under Articles I, II, and V of the 1825 Treaty, and the BIA's minimum law enforcement standards.

150. There is a substantial controversy between the Tribe and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

151.    The Tribe asks this Court to declare that the proper interpretation and construction of the promises made and obligations undertaken by the United States by and through the 1825 Treaty, the 1851 Treaty, the 1868 Treaty, the 1877 Act, the 1921 Snyder Act, the ILERA and the TLOA, and the trust relationship between the United States and the Tribe thereunder, is that the United States is legally obligated to provide for and to ensure adequate and effective law enforcement to the Tribe within the Pine Ridge Reservation.

## SECOND CLAIM FOR RELIEF

### Breach of Trust Responsibilities to Provide an Accounting

152.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

153.    A Tribe may bring a claim for mismanagement and accounting in the District Court. *Cobell v. Babbitt*, 30 F.Supp.2d 24 (D.D.C. 1998).

154.    The Defendants have an obligation "to not take actions or fail to act in a manner that results in the termination of any existing trust responsibility of the United States with respect to the Indian people." 25 U.S.C. § 5332.

155.    The Defendants also have an obligation "to not to reduce funds to make funding available for contract monitoring or administration by the Secretary." 25 U.S.C. § 5325(b)(1).

156.    The request to require accounting of law enforcement dollars appropriated by Congress is a request for specific remedies, which are an attempt to give the Tribe the thing to which it is entitled. *Modoc Lassen Indian Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*, 881 F.3d 1181 (10th Cir. 2017). The Tribe is entitled to request and review Defendants' use of law enforcement funds to ensure the Defendant is abiding by federal laws.

157.    By controlling and supervising law enforcement funding through federal actions, Defendants have undertaken a fiduciary relationship to the Tribe. *See United States v.*

*Mitchell*, 463 U.S. 206, 225 (1983).  The fiduciary relationship exists regardless of whether there is express language under a "statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection."  *Id*.  In fact, the presumption is that "all funds held by the United States for Indian tribes are held in trust."  *Rogers v. United States*, 697 F.2d 886, 890 (9th Cir. 1983).

158.  The Defendants have an obligation "to perform a complete historical accounting of" assets. *Cherokee Nation v. United States Dep't of Interior*, 531 F.Supp.3d 87, 99 (D.D.C. 2021) (quoting *Cobell v. Norton*, 240 F.3d 1081, 1102 (D.C. Cir. 2001).  This report "must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out." *Id.* (quoting *Cobell*, 240 F.3d at 1103).

159.  The Defendants use of 1999 TPA funding levels for law enforcement as its base law enforcement budget for the Tribe has prejudiced the Tribe because the Tribe's 1999 TPA law enforcement budget was abnormally low, resulting from   the Tribe's participation in the DOJ CIRCLE, COPS and other short-term DOJ grant programs.

160.  The Defendants use of 1999 TPA based funding levels has resulted in an arbitrary and capricious distribution of law enforcement funds and services and unfair treatment of the Tribe in relation to other tribes.

161.  The October 17, 2024 Partial Declination Letters, including the Tribe's proposal to operate the SRO, DDE, MMIP, and IA programs, were based on arbitrary and capricious base funding levels.

162.  An accounting of the use of funds requested from and allocated by Congress under the TLOA, the ILERA, and the 1921 Snyder Act for law enforcement services from 1998 to

the present time is a basic obligation of the Defendants in fulfillment of their Treaty, statutory and trust responsibilities to the Tribe.

163. The Tribe requests a Declaratory Judgment that the Defendants have a trust obligation to provide an accounting to the Tribe of the funds and uses of funds appropriated to Defendants by Congress for law enforcement services from 1998 to the present time.

164. The Tribe requests an order compelling the Defendants to provide a detailed accounting to the Tribe of its appropriations requests to the DOI, to OMB and to the Congress and the responses thereto, and of the funds received and used by each individual division of BIA and OJS from 1998 through the present date for law enforcement services. This accounting should include the following: (1) all OJS requests to DOI for inclusion in the President's budget request to Congress, and all responses thereto; (2) all requests made from DOI to OMB for the same purpose, and the responses thereto; (3) all direct, contracted and administrative funding provided to OJS by the Congress and/or DOI, including all specialty programs (including, but not limited to, the Drug Task Force, MMI Task Force, Police Academy, Internal Affairs Division, each District Office and each tribal law enforcement location (whether direct service or Tribally contracted)). Such accounting shall be by tribe or location, fiscal year, amount, and scope of work, and shall note: (1) the service population of each tribe or location served by OJS; (2) all payments of bonuses, special employee awards, or incentive payments made to federal OJS employees; and (3) the GS Ratings for all OJS full-time equivalent employees; and (4) such other accounting information as the Court deems appropriate.

## THIRD CLAIM FOR RELIEF

### Declination of Law Enforcement and Criminal Investigations Programs in Violation of ISDEAA, 25 U.S.C. § 5301 et seq.

165.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

166.    The ISDEAA requires the "amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract…." 25 U.S.C. §5325(a)(1). It also requires that the Secretary "at all times negotiate in good faith to maximize implementation of the self-determination policy." (25 U.S.C. § 5321 (f)(1)) and specifically provides that ISDEAA contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization." 25 U.S.C. § 5324(c)(2).

167.    The Secretary is required to approve a proposed ISDEAA contract, and such contract is deemed approved (25 C.F.R. §900.18), unless she provides within ninety days from receipt of the proposal "written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that" the proposal is declined under one or more of four specific circumstances. 25 U.S.C. §5321(a)(2); *see also* 25 C.F.R. §900.29 (requiring from the Secretary a "specific finding that clearly demonstrates . . . together with a detailed explanation of the reason for a decision to decline the proposal and, within 20 days, any documents relied on in making the decision . . . .")

168.    Defendant's October 17, 2024 partial declination Letters contain no specific findings or detailed explanation of the reason for the declination of the Tribe's proposal to operate the law enforcement ("LE") and criminal investigation ("CI") programs. The letters primarily assert that the level of funding requested by the Tribe "requests base funding . . . that is in excess of the Secretarial amount under 25 U.S.C. l§ 5321(a)(2)(D) and 25 C.F.R. §

900.22(d).   However, neither of the letters neither provided any details or documentation of the determination of the Secretarial amount claimed to have been exceeded, which is the sole ground for refusal.  There is also no explanation as to why the Tribe is tied to the dollar amount claimed to have been exceeded, particularly in light of the lump sum appropriated to the BIA by Congress and the obligations and duties undertaken by the United States in the 1825, 1851 and 1868 Treaties and Defendants under applicable statutes.

169.   Stating that the amount sought for the programs is in excess of the previously approved annual funding agreement does not, however, "clearly" demonstrate with a "detailed explanation" why the Tribe is tied to the previous year's funding, especially when that funding is tied to what has been shown to be incorrect and incomplete information, does not meet treaty or trust obligations and is based upon an artificially low base contract amount arbitrarily and capriciously assigned to the Tribe by  BIA over twenty years ago. Any statutorily sufficient explanation must, at a minimum, address how Defendants arrived at their determinations of the Secretarial amounts for the Law Enforcement and Criminal Investigation programs so that the Tribe may determine why its proposals are in excess of those amounts.  Merely stating that it is in excess of a previous year's annual funding agreement is not a clear, detailed explanation, particularly when such previous year's funding is also inadequate.

170.   Although Defendants October 17, 2024 partial declination letters of were issued within 90 days of the Tribe's FY 2025 contract proposals (the time period within which any declination must be issued), they do not meet the statutory or regulatory requirements for an effective declination of the Tribe's proposals.

171.    The 90-day period within which the Secretary is permitted to decline has passed.  It expired on or about October 17, 2025, the date of Defendants' deficient partial declination letters.

172.    The Tribe requests a declaratory judgment that the partial declinations of funding for the Tribe's Law Enforcement and Criminal Investigation programs violates the ISDEAA, 25 U.S.C. §§ 5321(a)(1)(E) and (a)(2) and 25 C.F.R. §900.29.

173.    The Tribe also requests an order requiring the Secretary to: (1) approve the Tribe's proposed FY 2025 contracts to operate the Law Enforcement and Criminal Investigation programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; and (3) add to the contracts the full amount of Title I funds pursuant to section 106(a)(1) of the ISDEAA for the operation of those programs.

## FOURTH CLAIM FOR RELIEF

### Declination of SRO, DDE, MMIP, and IA Programs in Violation of the ISDEAA, 25 U.S.C. § 5301 et seq.

174.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

175.    Defendants' October 17, 2024 partial declination letters do not contain any specific findings or any detailed explanation of the reason for the declination of the Tribe's proposal to operate the SRO, Division of Drug Enforcement ("DDE"), MMIP, and Internal Affairs ("IA") functions. The letters do not comply with the statutory or regulatory requirements for denying an ISDEAA contract under 25 U.S.C. §5321(a)(2) and 25 C.F.R. §900.22.  The letters include no specific finding clearly supporting the grounds recited, offer no detailed explanation of the facts on which the conclusions reached by the agency were based, nor cite to controlling legal authority that clearly demonstrates why the listed declination criteria apply.

176.    Defendants letters continue his disregard for the requirements of ISDEAA and its regulations.  Notifying and clearly demonstrating to the Tribe that the SRO, DDE, MMIP, and IA programs are central office functions that may not be lawfully carried out by the Tribe does not meet the requirements of  25 U.S.C. §5321(a)(2); 25 C.F.R. §900.29.  This decision ignores the fact that the Tribe sought only to contract the local portions of the programs, those necessary for their day-to-day operation and for the health and safety of the Tribal community.

177.    Although Defendants October 17, 2024 partial declination letters of were issued within 90 days of the Tribe's FY 2025 contract proposals (the time period within which any declination must be issued), they do not meet the statutory or regulatory requirements for an effective declination of the Tribe's proposals.

178.    The 90-day period within which the Secretary is permitted to decline has passed.  It expired on or about October 17, 2025, the date of Defendants' deficient partial declination letters

179.    The Tribe requests a declaratory judgment that the partial declination of funding for the SRO, DDE, MMIP, and IA programs in the Tribe's FY 2025 contract proposals to operate the SRO, DDE, MMIP, and IA programs violates the ISDEAA, 25 U.S.C. §§ 5321(a)(1)(E) and (a)(2).

180.    The Tribe also requests an order requiring the Secretary to:  (1) approve the Tribe's proposed contracts to operate the SRO, DDE, MMIP, and IA programs and approve the Tribe's proposed Annual Funding Agreements for FY 2025 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; and (3) add to the contracts the full amount of Title I funds pursuant to section 106(a)(1) of the ISDEAA for the operation of those programs.

**FIFTH CLAIM FOR RELIEF**

**Declination of the Tribe's Proposals to Operate the LE and CI Programs in
Violation of the ISDEAA, 25 U.S.C. § 5301 et seq.**

181.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

182.    Even if each of Defendants' October 17, 2025 partial declination letters were considered an effective declination, Defendants have not met their burden of proof, which is "to establish by clearly demonstrating the validity of the grounds for declining the contract proposal." 25 U.S.C. § 5321.

183.    In the October 17, 2024 partial declination letters, there is no discussion of how the ISDEAA Secretarial base funding amount was "determined" or of what the Secretary would have spent had it run the Law Enforcement or Criminal Investigation program under the United States' and Defendants' Treaty and statutory obligations, which is what the section 106(a)(1) amount requires.  25 U.S.C. § 5325(a)(1).  Neither is there a discussion of whether the Law Enforcement or Criminal Investigations programs funded by the section 106(a)(1) amount would be ineffective, unnecessary, or obsolete.  Thus, the letters contain no consideration, much less determination, of what funding level is "applicable" under the ISDEAA, the Treaties, or is necessary to carry out the standards required under the TLOA, the ILERA, and incorporated into the BIA Law Enforcement Handbook at 25 C.F.R. §§ 12.11, 12.14.  There is no showing that the Tribe's proposals were excessive given its Treaties and the demonstrated errors in the base funding amount being applied by Defendants.  Defendants' failure to make a finding relevant to this criterion renders each of the partial declinations deficient and arbitrary, capricious, and contrary to law.

184.    The BIA and OJS decision to calculate the Tribe's section 106(a)(1) amounts using a base amount actually expended from TPA funds in 1999 renders Defendants' partial disapproval

of the Tribe's FY 2025 contract proposals to operate its Law Enforcement and Criminal Investigations programs legally deficient and arbitrary. Nothing in the Treaties, the ISDEAA, the ILERA, or the TLOA authorizes or allows such an outcome.

185. The amount of funds required under ISDEAA section 106(a)(1) may not be determined arbitrarily. Such an interpretation would violate ISDEAA's requirement in section 106(a)(1) that the "amount of funds . . . [which] shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof *for the period covered by the contract*." 25 U.S.C. § 5325(a)(1) (emphasis supplied). The ISDEAA requires that the agency cannot simply pick a funding amount it used at any prior random point in time of its own choosing and merely impose that historic base funding amount on a Tribe as its current section 106(a)(1) determination. Rather, Congress directs that the section 106(a)(1) amount represents "what the Secretary would have provided for the operation of the programs" at the time of contracting. Given the current service population, the size of the Reservation, the Tribe's level of criminal activity, and the over 160,000 annual calls for service, this cannot be the amount calculated using the base funding the Secretary provided more than twenty years ago, when relevant conditions were vastly different, and cannot be the amount provided during a point in time when the amount of funds the Secretary "would have otherwise provided" was temporarily and artificially lowered by a substantial amount due to outside short-term DOJ funding.

186. The Defendants' actions violate the purpose of the ISDEAA, which is to end the "prolonged Federal domination of Indian service programs" by giving "Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities." 25 U.S.C. § 5301(a)(1).

187. Defendants' actions and failures to take corrective action violate the ISDEAA's express statutory obligation to carry out a meaningful Indian self-determination policy, which transitions away from federal domination of programs for Indians to allow meaningful participation by Indian people in the planning conduct and administration of federal programs, and to further the goal of "supporting and assisting Indian tribes in the development of strong and stable tribal governments."  25 U.S.C. § 5302.

188. 25 U.S.C. § 5321(f) requires that the Secretary shall:  "at all times negotiate in good faith to maximize implementation of the self-determination policy."

189. The Secretary's actions violate the duty of fair dealing in negotiating ISDEAA contracts by making a take-it-or-leave-it offer to the Tribe without any regard for the federal governments' Treaty, statutory and trust obligations, or any arm's length negotiation.

190. The Secretary cannot claim "good faith" negotiations when its representatives are unwilling to discuss the contract price or the contract's scope of work.

191. The Secretary engaged in bad faith negotiations when he refused to negotiate the contracts incorporation of School Resource Officers, Missing and Murdered Indigenous Persons functions, Internal Affairs, or additional drug officers.  The Secretary also engaged in "bad faith" when he notified the Tribe that he was only willing to approve a specific contract amount for each contract, and arbitrarily reached the contract amount in the absence of any treaty considerations or contract negotiation whatsoever.

192. In the absence of any negotiations whatsoever, a take-it-or-leave-it letter does not meet the "good faith" requirements of 25 U.S.C. § 5321 (f).

193.   Imposing such an outcome also violates several Indian self-determination policies articulated by the Secretary of the Interior and the Congress, including the commitment to the following:

   A.  Afford tribes the flexibility and discretion needed to design contractable programs to meet the needs of their communities, 25 C.F.R. 900.3(b)(3); and

   B.  Interpret federal laws and regulations in a manner that facilitates the inclusion of programs or portions of programs for the benefit of Indians in ISDEAA contracts.  25 C.F.R. 900.3(b)(8).

   C.  That the amounts of such contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization." 25 U.S.C. § 5324(c)(2).

194.   The Tribe requests that the Court enter an order finding that the October 17, 2024 partial declinations of the Tribe's FY 2025 contract proposals to operate the Law Enforcement and Criminal Investigations programs are arbitrary and capricious and otherwise not in accordance with law.

195.   The Tribe requests a declaratory judgment that the Defendants, as a matter of law, were required to:  (1) approve the Tribe's proposed contracts to operate the Law Enforcement and Criminal Investigation programs and approve the Tribe's proposed Annual Funding Agreement for FY 2025 related to those programs; (2) award the new contracts and the new AFAs as proposed for the operation of those programs; (3) add to the contracts the full amount of Title I funds pursuant to section 106(a)(1) of the ISDEAA for the operation of those programs; and (4) add to those contracts an amount appropriate to fulfill the United

States' treaty and trust obligations to provide adequate and effective law enforcement to the Tribe within the Pine Ridge Reservation.

196.   The Tribe further requests the Court to enter an Order compelling agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), namely compelling Defendants to: (1) approve the Tribe's proposed contracts to operate the Law Enforcement and Criminal Investigation programs and approve the Tribe's proposed Annual Funding Agreement for FY 2025 related to those programs; (2) award the amended contracts and the new AFAs as proposed for the operation of those programs; (3) add to the contracts the full amount of Title I funds pursuant to section 106(a)(1) of the ISDEAA for the operation of those programs; and (4) add to those contracts an amount appropriate to fulfill the United States' Treaty and trust obligations to provide adequate and effective law enforcement to the Tribe within the Pine Ridge Reservation.

### SIXTH CLAIM FOR RELIEF

### Declination of the Tribe's Proposals to Operate the SRO, DDE, MMIP, and IA Programs in Violation of the ISDEAA, 25 U.S.C. § 5301 et seq.

197.   The Tribe realleges the preceding paragraphs and incorporates them by this reference.

198.   The additional declination criterion cited in the October 17, 2024 partial declination letters declining the Tribe's proposals to operate the SRO, DDE (including Canine Units), MMIP, and IA programs in effect, (but without citing to or expressly relying upon,) invokes the declination criteria of 25 U.S.C. 5321(a)(2)(E), which provides that a contract proposal may be declined if "the program, function, service, or activity (or a portion thereof) that is the subject to the proposal is beyond the scope of the programs, functions, services, or activities covered under paragraph 1 [§ 5321(a)(1)(E)] because the proposal includes activities that cannot lawfully be carried out by the contractor."

199. The ILERA states that, subject "to the provisions of this Act and other applicable Federal or tribal laws, the responsibility of the Division of Law Enforcement Services in Indian country *shall include, . . . in cooperation with appropriate . . . tribal law enforcement agencies, the investigation of offenses against criminal laws of the United States*." 25 U.S.C. § 2802 (*emphasis added*).

200. Applicable federal or tribal laws do not limit this cooperative approach to law enforcement in Indian Country by removing the SRO, DDE, MMIP, and IA programs from tribal operations.

201. In passing the TLOA, Congress expressly found that "tribal justice systems are often the most appropriate institutions for maintaining law and order in Indian country." 25 U.S.C. § 2801(2)(B).

202. The TLOA's purpose is "to empower tribal governments with the authority, resources, and information necessary to safely and effectively provide public safety in Indian country." *Id.* at (b)(3).

203. The ISDEAA requires the Secretary "to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs *or portions thereof* . . .." 25 U.S.C. § 5321(a)(1) (emphasis added).

204. Defendants' assertion that the local portions of the SRO, DDE, MMIP, and IA programs "cannot be properly maintained" due to either (1) the "Tribe [having] not allocated a contractible amount of funds that the Tribe could use to carry out this new function in a satisfactory manner," or (2) because "BIA OJS has not allocated a contractible amount of funds . . . that the Tribe could use to carry out these new functions and position in a satisfactory manner"; or (3) "because it would serve only a single reservation instead of

61

providing service to all of Indian Country"; or that "the service to be rendered to the Indian beneficiaries will not be satisfactory because any portion of the funding potentially allocable to the Tribe would not adequately meet" the requirements of the function or position,  directly contravenes the Tribe's right to choose to contract only a portion of a program under ISDEAA, the cooperative mandate in the ILERA, and the purpose of the TLOA to empower tribal justice systems.

205.    The Tribe had successfully operated the SRO, DDE, MMIP, and IA programs for years. For Defendants to take the position that these functions cannot be contracted, with no analysis showing controlling legal authority to support that assertion, denies the Tribe its contracting rights under the ISDEAA and effectively repeals the "or portions thereof" option provided in ISDEAA.  25 U.S.C. § 5321(a)(1).

206.    Defendant's actions put the Tribe in the untenable—and unacceptable—position of both foregoing its right to an ISDEAA contract and impeding the Tribe's ability to engage in the day-to-day activities that are necessary to maintain law and order on the Reservation.

207.    Defendants' actions force the Tribe to rely on the OJS's Rapid City-based Drug Task Force and a Missing and Murdered Indigenous Persons Task Force, both 80 miles away, to respond to a random drug sale and a missing persons call respectively.  This is particularly serious when the Tribe receives a service call about a missing person and the first 48 hours is critical.

208.    Defendants' actions also ties the Tribe's hands in investigating citizen complaints against police officers because OJS internal affairs investigations have generally taken up to a year to complete and have sometimes taken up to three years to complete.

209. This delay has prevented Oglala Sioux Tribal officers from getting Special Law Enforcement Commissions while waiting for the results of the Indian Bureau of Internal Affairs' work and has caused problems for the working relationship between the Tribal police and members of the local community.

210. Defendants' refusal to contract the SRO, DDE, local MMIP, and IA programs directly contravenes the ISDEAA's express statutory commitment to carry out a meaningful Indian self-determination policy, which transitions away from federal domination of programs for Indians to allow meaningful participation by Indian people in the planning conduct and administration of federal programs, and to further the goal of "supporting and assisting Indian tribes in the development of strong and stable tribal governments."  25 U.S.C. § 5302(b).

211. Defendants' declinations to contract the requested services violates the Indian self-determination obligations imposed under the ISDEAA, including the commitment to:

   D. Afford tribes the flexibility and discretion needed to design contractable programs to meet the needs of their communities, 25 C.F.R. 900.3(b)(3); and

   E. Interpret federal laws and regulations in a manner that facilitates the inclusion of programs or portions of programs for the benefit of Indians in ISDEAA contracts. 25 C.F.R. 900.3(b)(8).

   F. "The amounts of such contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."

   25 U.S.C. § 5324(c)(2).

212. The Tribe requests that the Court set aside the declinations of the Tribe's proposals to operate the SRO, DDE (including Canine Units), and local MMIP and IA programs as being arbitrary and capricious and otherwise not in accordance with law.

213.    The Tribe also requests a declaratory judgment that Defendants, as a matter of law, were required to do the following: (1) approve the Tribe's proposed contracts to operate the SRO, DDE (including Canine Units), and local MMIP and IA programs and approve the Tribe's proposed Annual Funding Agreement for FY 2025 related to those programs; and (2) award the contracts and the new AFAs as proposed for the operation of those programs.

214.    The Tribe further requests the Court to enter an Order compelling agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. 706(1), namely compelling Defendants to:  (1) approve the Tribe's proposed contracts to operate the SRO, DDE (including Canine Units), and local MMIP and IA programs and approve the Tribe's proposed Annual Funding Agreement for FY 2025 related to those programs; and (2) award the amended contracts and the new AFAs as proposed for the operation of those programs;.

## SEVENTH CLAIM FOR RELIEF

## Violation of the APA, 5 U.S.C. §§ 551 et seq. and 701 et seq.

215.    The Tribe realleges the preceding paragraphs and incorporates them by this reference.

216.    Because through the 1921 Snyder Act "Congress specifically appropriated funds" for tribal law enforcement services while also placing, through the TLOA and the ILERA, "statutory conditions upon the expenditure" of those funds, Defendants' decisions related to the provision of tribal law enforcement services are judicially reviewable.  *Yankton Sioux Tribe v. U.S. Dept. of Health and Human Services*, 869 F. Supp. 760, 765 (D.S.D. 1994).

217.    Defendants arbitrarily and irrationally limited the Tribe's base contract amounts to the artificially low amounts set by the BIA over 20 years ago in 1999, which ignored the United States' Treaty and trust obligations, and which funds significantly fewer police officers on the Pine Ridge Reservation than the Defendants were funding in 1879, and which funds far fewer officers that its own minimum standard of 2.8 officers per 1,000-service population

prescribes.  Such funding decision is arbitrary and capricious, an abuse of discretion, and contrary to law.

218.  The Defendants' base funding decisions violate ISDEAA § 106(a)(1) requirement to provide the "amount of funds . . . [which] shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof *for the period covered by the contract*." 25 U.S.C. § 5325(a)(1) (emphasis supplied).

219.  The ISDEAA does not permit Defendants to ignore the promises the United States made in Treaties and pick a funding amount Defendants used more than 20 years ago and impose that historic base funding amount on a Tribe as its current ISDEAA § 106(a)(1) base funding amount.  Rather, Congress directs that the section 106(a)(1) amount represents "what the Secretary would have provided for the operation of the programs" at the time of contracting.  Given the United States' Treaty and trust obligations and Secretary's statutory and trust obligations, the current law enforcement service population, the size of the Reservation, the distance between its residential communities, the crime statistics, and the extremely high numbers of calls for assistance to OST DPS, the section 106(1)(1) amount cannot be the amount which is based upon the amount the Secretary provided more than twenty years ago, when relevant conditions were vastly different, and cannot be the amount provided during a point in time when the amount of funds the Secretary "would have otherwise provided" was temporarily and artificially lowered by being offset by a substantial amount due to outside short-term DOJ funding.

220.  The BIA and OJS October 17, 2024 partial declination decisions on the Law Enforcement and Criminal Investigations funding amounts violate the "Additional responsibilities" of the Secretary, BIA, and OJS pursuant to 25 U.S.C. § 2802(c) (carrying forward the 1825,

1851 and 1868 Treaty obligations of the United States Government to "enforce Federal law" through the investigation, arrest, and punishment of offenders).

221.   Defendants' October 17, 2024 partial declination decisions on the Law Enforcement and Criminal Investigations funding amounts violates the purpose of ISDEAA, which is to end the "prolonged Federal domination of Indian service programs" by giving "Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities."  25 U.S.C. § 5301(a)(1).

222.   Defendants' decision to calculate the Tribe's ISDEAA section 106(a)(1) amounts by using a base amount expended from TPA funds in 1999 renders its partial disapprovals of the Tribe's contract proposals deficient, arbitrary and capricious and otherwise not in accordance with law.   Nothing in the ISDEAA, the ILERA, or the TLOA authorizes such an outcome.

223.   Because Defendants failed to comply with their obligations under its Treaties, the 1877 Act, the 1921 Snyder Act and implementing law in the ISDEAA, the ILERO and the TLOA, the Tribe is entitled to declaratory and injunctive relief under the APA, in addition to remedies that may be available directly under the ISDEAA, for Defendant's failure to adequately fund the Tribe's section 106(a)(1) amount for Law Enforcement and Criminal Investigation services.

224.   For these reasons, the Tribe is entitled to a declaratory judgment that Defendants violated the APA, 5 U.S.C. §§ 551 *et seq.* and 701 *et. seq.*, by relying on an inaccurate, artificially lowered amount in determining the Tribe's base law enforcement and criminal investigations contract amounts and not making any determination as to the section

106(a)(1) amounts required for the "operation of the programs or portions thereof for the period covered by the contract" in violation of 25 U.S.C. § 5325(a).

225.   The Tribe is also entitled  to an order compelling agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), namely compelling Defendants to comply with the statutory requirements of 25 U.S.C. § 2802 and 25 U.S.C. § 5325(a) by properly funding the Tribe's section 106(a)(1) amounts at a level sufficient  to adequately and  effectively enforce federal and Tribal law on the Reservation through investigation, arrest, and punishment of offenders.

## **PRAYER FOR RELIEF**

WHEREFORE, the Tribe prays for the following relief:

1.   A declaratory judgment stating that:

A.  The United States has a Treaty and trust responsibility to provide adequate and effective law enforcement to the Tribe and its members within the Pine Ridge Reservation, including the prompt and diligent investigation and reporting of all complaints of crime, and the arrest and punishment of all offenders who violate federal or tribal law or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member;

B.  Defendants have a statutory and trust obligation to the Tribe to provide for and adequately equip a sufficient number of law enforcement and criminal investigations officers on the Pine Ridge Reservation to reasonably ensure that the United States' Treaty, statutory and trust obligations are met, and that the Defendants are providing for the  prompt and diligent investigation and reporting of all complaints of crime, and the arrest and punishment of all offenders who violate federal or Tribal law or otherwise

67

threaten or harm the Tribe or its property, or the person or property of any Tribal member, and that Defendants are violating those obligations to the Tribe; and

C.  Defendants violated 25 U.S.C. § 5321(a)(2)(E) by improperly declining those portions of the Tribe's programs that are contractable by the Tribe under 25 U.S.C. § 5321 (a)(1); and

D.  Defendants have violated the APA and 25 U.S.C. § 5321(a)(2)(D) by partially declining those portions of the Tribe's contract proposals, which Defendants determined to be "in excess" of the applicable Section 106(a)(1) amounts, based upon an irrational, arbitrary, and unreasonable base amount that it unilaterally arrived at over twenty years ago, which is far below the Tribe's actual needs; far below the amount that the federal government obligated itself to in the 1825, 1851 and 1868 Treaties, the 1877 Act, and far below the amount that the BIA concluded was necessary in its own Gap Analysis and the OJS TLOA Reports to Congress. Additionally, that Defendants knew such amounts were based upon arbitrary and incomplete information that Defendants chose at a time when they knew that the Tribe was supplementing its law enforcement services budget with temporary and long since expired DOJ grant funds; and

E.  Defendants violated their trust duty owed to the Tribe arising under the 1825, 1851, and 1868 Treaties, as carried forward in the 1921 Snyder Act, the ILERA , the TLOA, and federal common law, to ensure that the law enforcement services provided to the Tribe are effectively carried out in a manner that reasonably ensures the investigation and reporting of all crimes, and the timely arrest and punishment of offenders; and

F.  Defendants' inadequate funding of the Tribe's law enforcement programs violates the rights of the Tribe and its members under the 1825, 1851, and 1868 Treaties, the 1877

Act, the 1921 Snyder Act, the ILERA, the TLOA, and violates the Defendants' trust

duty to the Tribe; and

G. The Defendants have a trust obligation to provide an accounting to the Tribe of the

funds and uses of funds appropriated to Defendants by Congress for law enforcement

services from 1998 to the present time.

2.     An Order compelling Defendants to:

A. Fund and equip a minimum of 2.8 tribal law enforcement officers per 1,000 law

enforcement service population, as defined by the scope of federal and tribal

jurisdiction, according to the BIA standard for an adequate, basic law enforcement

program articulated in its own GAP Analysis and its TLOA Reports for Congress, and

to base such funding and equipment on the aforementioned law enforcement service

population, the distance between on-Reservation residential communities, the

Reservation size, the present day number of crimes and E-911 service calls, in

compliance with the United States' Treaty and trust obligations; and

B. Comply with 25 U.S.C. § 5321(a) by approving the Tribe's proposal to contract and

operate the Division of Drug Enforcement, Missing and Murdered Unit, Internal

Affairs, and School Resource Officer Programs; and

C. Comply with their Treaty and trust duties to the Tribe by taking sufficient measures to

ensure effective, prompt, and diligent investigation and reporting of all crimes on the

Reservation and the immediate arrest and punishment of offenders; and

D. Provide a detailed accounting to the Tribe of its appropriations requests to the

Department of the Interior (DOI), to OMB and to the Congress and the responses

thereto, and of the funds received and used by each individual division of BIA and OJS

from 1998 through the present date for law enforcement services. This accounting should include the following: 1) all OJS requests to DOI for inclusion in the President's budget request to Congress, and all responses thereto; 2) all requests made from DOJ to OMB for the same purpose, and the responses thereto; 3) all direct, contracted and administrative funding provided to OJS by the Congress and/or DOI, including all specialty programs (including, but not limited to, the Drug Task Force, MMI Task Force, Police Academy, Internal Affairs Division, each District and each tribal law enforcement location (whether direct service or tribally contracted)). Such accounting shall be by Tribe or location, fiscal year, amount, and scope of work, and shall note: (1) the service population of each tribe served under OJS; (2) all payments of bonuses, special employee awards, or incentive payments made to federal OJS employees; (3) the GS rating for all OJS full-time equivalent employees; and (4) such other accounting information as the court deems appropriate.

3.   An Order temporarily, preliminarily, and permanently restraining Defendants from continuing to assign a base ISDEAA law enforcement funding amount to the Tribe based upon the Tribe's 1999 TPA law enforcement budget.

4.   Award to the Tribe of its costs, fees and expenses incurred in this lawsuit, including attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable statutes, and under general principles of law and equity.

5.   Such other and further relief as this Court may deem just and proper.

Dated:  October 17, 2025                 Respectfully submitted,

Gregory M. Narvaez, SD Bar No. 4381
Peebles Bergin Schulte & Robinson LLP

70

2020 L Street, Suite 250
Sacramento, CA 95811
Telephone: (916) 441-2700
Email: gnavarez@ndnlaw.com

Conly Schulte, *Pro hac vice pending*
Peebles Bergin Schulte & Robinson LLP
945 Front St.
Louisville, CO 80027
Telephone: (303) 284-8228
Email: cschulte@ndnlaw.com

Steven J. Bloxham, *Pro hac vice pending*
Peebles Bergin Schulte & Robinson LLP
2020 L Street, Suite 250
Sacramento, CA 95811
Telephone: (916) 441-2700
Email: sbloxham@ndnlaw.com

Patricia A. Marks, *Pro hac vice pending*
15992 A.E. Mullinix Rd.
Woodbine, MD 21797
Telephone: (202) 256-5033
Email: markspattyesq@aol.com

*Attorneys for the Oglala Sioux Tribe*